**MANTEX, INC., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Allied Tube & Conduit Corp., Defendant–Intervenor.**

**Court No. 92–01–00020.**

United States Court of International Trade.

Dec. 22, 1993.

Wilkie Farr & Gallagher, William H. Barringer, Theodore C. Whitehouse, Daniel L. Porter, and Christopher S. Stokes, Washington, DC, for plaintiffs Mantex, Inc. and Tata Iron and Steel Corp.

Frank W. Hunger, Asst. Atty. Gen., of the U.S., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Marc E. Montalbine; Jeffery C. Lowe, Atty., Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, of Counsel, for defendant.

Schagrin Associates, Roger B. Schagrin, R. Alan Luberda, and Gail S. Usher, Washington, DC, for defendant-intervenor Allied Tube & Conduit Corp.

## OPINION

CARMAN, Judge:

Plaintiffs bring this consolidated action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) (1988) to contest the final determination by

the International Trade Administration, Department of Commerce (ITA or Commerce) in the 1987–1988, 1988–1989 administrative reviews of the antidumping duty order issued in *Certain Welded Carbon Steel Standard Pipes and Tubes From India*, 51 Fed.Reg. 17,384 (Dep't Comm.1986) (antidumping duty order). *See Certain Welded Carbon Steel Standard Pipes and Tubes From India*, 56 Fed.Reg. 64,753 (Dep't Comm.1991) (final admin. rev.) (*Final Review*). Plaintiffs seek judgment pursuant to USCIT R. 56.1. This Court has jurisdiction under 28 U.S.C. § 1581(c) (1988) and, for the reasons which follow, enters judgment for defendants.

## I. BACKGROUND

The administrative reviews at issue in this case arise from the ITA's final determination in *Certain Welded Carbon Steel Standard Pipe and Tube From India*, 51 Fed.Reg. 9089 (Dep't Comm.1986) (final determ.) (*Final Determination*). In the *Final Determination*, Commerce found plaintiff Tata Iron and Steel Corp. (TISCO) was selling or was likely to sell standard pipe and tube from India in the United States at less than fair value (LTFV). 51 Fed.Reg. at 9090. The ITA also determined a weighted-average dumping margin of 7.08 percent for TISCO. *Id.* The International Trade Commission later found the imports at issue were materially injuring a United States industry. *Certain Welded Carbon Steel Standard Pipes and Tubes From India*, 51 Fed.Reg. 17,384 (Dep't Comm.1986) (antidumping duty order). Based on the LTFV and injury findings, Commerce issued an antidumping duty order incorporating the weighted-average antidumping duty margins set forth in the *Final Determination*. *Id.* at 17,384–85.

The ITA subsequently undertook two consecutive administrative reviews of imports of standard pipe and tube from India into the United States. *Certain Welded Carbon Steel Standard Pipes and Tubes From India*, 56 Fed.Reg. 26,650 (Dep't Comm.1991) (prelim. admin. review) (*Preliminary Review*).

These reviews assessed imports made by TISCO during two consecutive periods which began on May 1, 1987 and ended on April 30, 1989.[1] *Id.* The first review covered shipments from May 1, 1987 through April 30, 1988 and the second review extended from May 1, 1988 through April 30, 1989. *Id.* Commerce preliminarily determined dumping margins of 77.94 percent for the first period and 86.71 percent for the second period. *Id.* at 26,652. In the *Final Review*, Commerce slightly revised these figures, establishing margins of 77.32 and 87.39 percent for the first and second periods, respectively. 56 Fed.Reg. at 64,763.

Four aspects of the *Final Review* are pertinent to the instant case. The first is the ITA's decision to deny TISCO a circumstances of sale (COS) adjustment for rebate payments that the company received under India's International Price Reimbursement Scheme (IPRS). Although Commerce had previously made a COS adjustment to TISCO's home market sales price for IPRS payments in the *Final Determination*,[2] Commerce reversed its position in the administrative reviews.

The ITA refused to make a COS adjustment for the IPRS payments for three reasons. First, the ITA did not find the payments to be "*bona fide* circumstance[s] of sale" because they did not allow TISCO to provide "its customers with something of value other than the standard pipe subject to the sales transaction." *Id.* at 64,757. Commerce based its finding on the fact it "did not find that the price differential between sales of such or similar merchandise was 'due in any way to greater direct selling expanses [sic] or to value in addition to the physical article itself being conveyed to purchasers in the higher-priced market.'" *Id.* (citing *Cyanuric Acid and its Chlorinated Derivatives from Japan Used in the Swimming Pool Trade*, 49 Fed.Reg. 7424, 7427 (Dep't Comm.1984) (final determ.)).

---

1. The reviews also covered shipments made by Jindal Pipes Ltd. (Jindal). Because the instant action only challenges the ITA's findings pertaining to TISCO, the Court does not address the ITA's conclusions affecting Jindal.

2. *See* 51 Fed.Reg. at 9091.

In addition, even assuming the IPRS payment were a bona fide circumstance of sale, Commerce declined to grant a COS adjustment because it found the payments were not "directly related" to TISCO's United States sales. *Id.* at 64,757–58 (citing *Negev Phosphates, Ltd. v. United States,* 12 CIT 1074, 699 F.Supp. 938 (1988); *Industrial Phosphoric Acid from Israel,* 52 Fed.Reg. 25,440 (Dep't Comm.1987) (final determ.)). Because the payments "are merely predicated upon the act of exportation," Commerce indicated the payments were "tied to" sales rather than "directly related" to sales. *Id.* In addition, Commerce emphasized the fact that the IPRS enabled TISCO to receive benefits on United States sales that it did not receive on comparable home-market sales. *Id.* at 64,758.

The final reason Commerce cited for denying the COS adjustment is that the IPRS payments stem from production costs rather than from TISCO's marketing practices. *Id.* (citing *Spun Acrylic Yarn from Italy,* 50 Fed.Reg. 35,849 (Dep't Comm.1985) (final admin. review)). In sum, because the IPRS payments result from decisions pertaining to raw material input rather than from marketing practices, the ITA concluded the payments did not permit a COS adjustment. *Id.*

The second aspect of the *Final Review* at issue in the instant case is the ITA's refusal to grant TISCO a COS adjustment to reflect a trademark premium the company allegedly realized on its home market sales. Commerce denied TISCO a COS adjustment for the claimed trademark premium because the company failed to provide "the Department with credible information, based on generally accepted trademark valuation techniques, which would indicate what portion, if any, of the home-market price is due to the alleged trademark premium." *Id.* at 64,759. According to the ITA, TISCO's proposed valuation methodology, which relies on price differentials between its product and a competitor's product, is improper "since any number of factors could explain why one manufacturer's prices for standard pipe are different from those of another manufacturer." *Id.* Although Commerce found TISCO "provided some information showing that the prices it

charges for pipe and tube are higher than the prices charged by its competitors for comparable products," Commerce concluded "TISCO has not provided sufficient evidence nor has it proved what portion of the differential ... is attributable to the trademark premium, let alone quantified any such premium precisely." *Id.*

The third pertinent aspect of the *Final Review* is the ITA's decision to exclude TISCO's home market sales of American Society of Testing Materials (ASTM) pipe in determining the company's home market price. The ITA decided to exclude TISCO's home market sales of ASTM pipe because it found the company did not make the sales in the ordinary course of trade. *Id.* at 64,755. After considering several factors, Commerce concluded "sales of ASTM pipe were not normal in terms of the domestic market for standard pipe in India." *Id.*

Although Commerce had previously found such sales to be in the ordinary course of trade, Commerce reversed its position in the *Final Review.* The ITA indicated its finding in the original investigation did not preclude a different result in a subsequent administrative review, citing *PPG Indus., Inc. v. United States,* 13 CIT 297, 301–02, 712 F.Supp. 195, 199 (1989). *Id.* at 64,756. Commerce explained that deficiencies in information submitted by TISCO in the original investigation prevented Commerce from assessing whether the company's ASTM home market sales were in the ordinary course of trade. *Id.* According to Commerce, it was not until the instant administrative reviews that certain facts emerged on the record that raised legitimate questions as to whether TISCO's ASTM sales were in the ordinary course of trade. *Id.*

In particular, the Department found during verification that, whereas IS pipe for sale in India receives only minimal packing and is stamped with the "TATA" trademark, the ASTM pipe sold in India was packed for export and unstamped, lending credence to petitioners' allegation that sales of ASTM standard pipe in India were actually production overruns or returns on export sales.

*Id.* Commerce also indicated other information concerning the different channels of trade that TISCO used to market ASTM and IS pipe and the company's divergent pricing practices for the different pipes permitted Commerce to consider whether the ASTM sales were outside the ordinary course of trade. *Id.*

In determining whether TISCO's sales of ASTM pipe were outside the ordinary course of trade in the Indian domestic market, Commerce assessed four factors. First, it "considered the differences in standards and product uses between ASTM and [Indian Standard or] IS pipe." *Id.* at 64,755. Commerce emphasized the fact that "[t]he use of ASTM pipe in the Indian domestic market is drastically limited because this pipe is measured in inches and fractions thereof. . . . [And a]s a consequence, ASTM pipe does not conform with Indian building codes or government specifications." *Id.* The ITA also rejected TISCO's contention that the ASTM pipe sold in India had structural applications, finding instead that the majority of such pipe sold in India was threaded and coupled. According to Commerce, because consumers use threaded and coupled pipe for conveying materials rather than for standard structural purposes, the ASTM pipe is not readily adaptable to standard use and, therefore, "any market for ASTM pipe in India can only be marginal." *Id.*

The second factor that Commerce addressed was the comparative volume of sales and number of buyers of ASTM and IS pipe in the Indian home market. *Id.* Commerce "found that the overwhelming majority of standard pipe sold in India is IS pipe, not ASTM pipe." *Id.* Moreover, Commerce noted, as compared to IS pipe, TISCO sells ASTM pipe in much smaller volumes and at a great discount. *Id.* Commerce also pointed to the fact that TISCO "stated that only two of its many distributors in India sell ASTM pipe for resale to . . . rural customers. . . ." *Id.*

The third factor that Commerce considered was the price and profit differentials between ASTM and IS pipe sold in the home market. *Id.* Specifically, Commerce found "a wide disparity in sale prices between ASTM and IS pipe in India, the latter being consistently sold at much higher prices than the former even though IS pipe is the country standard." *Id.* Commerce indicated the price disparity between the two pipes is especially significant because TISCO's production costs for both pipes is "substantially equivalent." *Id.*

The final factor that Commerce analyzed was whether the ASTM pipe sold in the Indian home market consisted of production overruns or seconds. *Id.* Although TISCO claimed the sales were not overruns or seconds during the period leading up to the *Final Review*, Commerce stressed the fact that in the verification report in the original investigation "TISCO officials stated that these sales were 'cost overruns.'" *Id.* According to Commerce, "TISCO has not offered . . . any information to counter their previous admission." *Id.* While Commerce officials did see purchase orders and invoices for ASTM pipe during verification, Commerce concluded "these orders and invoices only show that two distributors purchased relatively small quantities of ASTM pipe of resale." *Id.* Commerce reasoned that "[t]he existence of purchase orders and invoices does not speak to the issue of whether the merchandise involved consists of production overruns because that it is not the purchasers' concern." *Id.* Commerce also noted TISCO did not make its production records for standard pipe available to Department officials or tie those records "to specific requests by Indian distributors for ASTM pipe." *Id.*

The final aspect of the *Final Review* at issue is Commerce's decision to use best information available (BIA) in order to determine TISCO's United States price. The ITA resorted to BIA after it rejected TISCO's post-verification responses. Commerce indicated it rejected the responses because the company failed to provide complete and accurate responses despite the fact that the company had an "extremely long span of time and . . . multiple opportunities" to do so. *Id.* at 64,761. According to Commerce, during verification TISCO gave department officials "substantial amounts of new information that they had not time to evaluate and analyze."

*Id.* As a result, the ITA based "the final results of the instant reviews on information TISCO submitted prior to verification, for U.S. sales reported in a timely fashion, and on petitioners' BIA for the unreported U.S. sales." *Id.·*

## II. CONTENTIONS OF THE PARTIES

### A. *Plaintiffs*

Plaintiffs challenge four aspects of the *Final Review.* First, plaintiffs contend the ITA improperly refused to grant TISCO a COS adjustment based on the IPRS rebates that the company received. Pls.' Br. at 10. In short, plaintiffs argue the rebates are directly related to United States sales and therefore entitle TISCO to a COS adjustment, citing *Sawhill Tubular Div. Cyclops Corp. v. United States,* 11 CIT 491, 499–500, 666 F.Supp. 1550, 1556–57 (1987) (upholding Commerce's COS adjustment for IPRS payments); *Certain Iron Construction Castings from India,* 55 Fed.Reg. 40,697 (1990) (final admin. review). *Id.* at 11–14. As TISCO receives the rebates only for its exports and does not receive them for its home market sales, plaintiffs assert Commerce must account for the lack of rebate in computing the company's foreign market value by granting the company a COS adjustment. Pls.' Reply Br. at 8–9. Moreover, plaintiffs maintain because the facts, laws, and regulations presented in the administrative reviews are identical to those presented in the original investigation in which Commerce granted a COS adjustment, Commerce's decision to deny a COS adjustment in the administrative reviews is unreasonable, arbitrary and capricious. Pls.' Br. at 15.

Second, plaintiffs contend the ITA erroneously refused to make a COS adjustment for the trademark premium that plaintiffs claim TISCO receives on its home market sales of IS pipe. *Id.·*at 28. Plaintiffs argue such an adjustment is proper even though it is a "value-based" difference rather than a cost-based difference. *Id.·* at 37–39. Plaintiffs urge Commerce should have accounted for TISCO's trademark premium by comparing the pricing trends in the Indian market with the price charged by TISCO and by considering the product-specific profits earned by

other companies with those of TISCO. *Id.* at 32–35. Plaintiffs claim such a methodology is viable because "[g]enerally accepted methods of trademark valuation assume that the disparity in rate of return for one company from the 'normal or standard' rates of return for other producers in an industry is equal to the value of a company's trademark premium." *Id.* at 32 (emphasis omitted). Plaintiffs maintain their methodology is preferable as it only examines those transactions involving the product under review and does not assess the company's overall earnings which would include transactions of products that are not under review. *Id.* at 32–34. In addition, plaintiffs assert a COS adjustment is proper because TISCO can demonstrate how it accounted for and quantified its trademark premium in setting its home market price, citing *Color Television Receivers From Korea,* 49 Fed.Reg. 7820, 7827 (Dep't Comm. 1984) (final determ.). *Id.* at 36.

Third, plaintiffs assert Commerce wrongfully excluded TISCO's home market sales of ASTM pipe in determining the company's home market price. *Id.* at 18. According to plaintiffs, in determining the foreign market value of merchandise that an importer sells in the United States, Commerce must use the same merchandise that the importer sells in the United States rather than merchandise that is only similar to what the importer sells in the United States. *Id.* Because the product at issue in the administrative reviews is ASTM pipe and TISCO sells the identical product in its home market, plaintiffs argue Commerce erroneously excluded these home market sales from its foreign market value analysis. *Id.* In short, plaintiffs urge the ITA should have included TISCO's home market sales of ASTM pipe because, contrary to Commerce's findings, the company made the sales in the ordinary course of trade. *Id.*

Plaintiffs also contest each basis upon which Commerce found TISCO's home market sales of ASTM pipe to be outside the ordinary course of trade. With respect to the various bases considered by Commerce, plaintiffs maintain the following: (1) there is a real and bona fide demand for ASTM pipe in the home market for use as a type of

structural support, a standard use; (2) even assuming the use is not standard, the sales of the pipe, not its ultimate use, determine whether TISCO sold the product in the ordinary course of trade; (3) the low volume of home market sales of ASTM pipe relative to IS pipe does not preclude the conclusion that TISCO sells ASTM pipe in the ordinary course of trade; (4) the low profits received from home market sales of ASTM relative to IS sales are irrelevant to the ordinary course of trade issue because Commerce never found the ASTM home sales to be below cost; and (5) the ASTM home market sales were not production overrun sales, and, even if they were, the fact that Commerce used these sales in the original determination as the basis for the less than fair value comparison demonstrates the sales were not outside the ordinary course of trade. *Id.* at 20–28.

Fourth, plaintiffs challenge Commerce's decision to use BIA in order to determine TISCO's United States price. *Id.* at 41–54. Plaintiffs argue Commerce improperly relied on the fact that TISCO had omitted information pertaining to eight invoices covered by the 1987–1988 review and twenty-four invoices covered by the 1988–1989 review in resorting to BIA. *Id.* at 43. According to plaintiffs, the omissions did not permit Commerce to resort to BIA because: (1) TISCO alerted Commerce to the omissions at least one week before verification; (2) the omissions only cover a small amount of the total volume of the company's total sales;[3] and (3) the company cooperated with Commerce during verification. *Id.* at 43–44. In addition, plaintiffs claim the various factors upon which Commerce ordinarily relies "in deciding whether to accept corrections of errors and omissions found during the verification process" also preclude Commerce from rejecting TISCO's actual sales information and using BIA. *Id.* at 44–49. Finally, even assuming Commerce's use of BIA was justified, plaintiffs maintain Commerce improperly selected punitive information as BIA as TISCO fully cooperated with Commerce during the administrative reviews. *Id.* at 49–54.

**3.** According to plaintiffs, the omissions accounted for 1.4 percent and 4 percent of TISCO's total

## B. *Defendants*

The government and Allied Tube (defendants) advance several arguments to support the ITA's determination in the *Final Review.* Defendants' first principal contention is that Commerce properly refused to grant TISCO a COS adjustment for the IPRS rebates. Defendants cite three reasons for their position. First, defendants claim a COS adjustment is unwarranted because TISCO failed to demonstrate the IPRS payments caused the company to incur a "greater direct selling expense" which ultimately affected its prices in the home market and/or the United States. *Id.* at 24–30. According to defendants, companies have greater direct selling expenses in a particular market only when they provide customers in that market with something of value other than the merchandise involved in their transactions. *Id.* at 24–25. Defendants maintain TISCO did not provide its United States customers with any additional value and, therefore, did not have any greater direct selling expenses that would permit a COS adjustment. *Id.*

Second, defendants argue a COS adjustment is unwarranted as TISCO has not shown the IPRS rebate payments to be directly related to the company's United States sales within the purview of 19 C.F.R. § 353.-56(a)(1). *Id.* at 30–36. Instead, defendants assert the payments are only "tied to" TISCO's United States sales because they derive from the act of exportation rather than from individual sales transactions. *Id.* at 33. According to defendants, the mere fact that TISCO received the rebates because it exported its merchandise does not establish the causal link between the rebates and the "differential between United States price and foreign market value" that is necessary for a COS adjustment. *Id.* at 35 (citing *Smith-Corona Group v. United States,* 1 Fed. Cir.(T) 130, 138–39, 713 F.2d 1568, 1577 (1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984)). In sum, defendants claim

TISCO's IPRS rebates are an item of general revenue which it receives from the Indian government. TISCO can use this

volume of sales for the 1987–1988 and 1988–1989 reviews, respectively.

money in any manner it sees fit. TISCO need not use this money to lower the price of its product in the United States. Accordingly, receipt of this rebate does not necessarily cause any price differential between U.S. price and foreign market value. Commerce, therefore, properly determined [the rebates] were not "directly related" to the reviewed sales and did not qualify for a [COS] adjustment.

*Id.* at 35–36.

Finally, defendants urge Commerce properly reversed its policy with respect to granting COS adjustments for the IPRS payments. Defendants note Commerce began to reconsider its policy of granting COS adjustments for dual-pricing schemes, such as India's IPRS program, as early as 1988, and finally reversed its policy in 1991, immediately before it issued the *Preliminary Review* in this case. *Id.* at 21–23. Moreover, defendants claim Commerce fully explained its reasons for departing from its past practice upon publishing the *Preliminary Review*. *Id.* at 23. In addition, while acknowledging the Court of International Trade (CIT) upheld Commerce's former policy of granting COS adjustments for IPRS rebate payments in *Sawhill*,[4] defendants nevertheless argue the CIT neither held that such adjustments were necessary nor precluded Commerce from reexamining the issue on a subsequent administrative record and "reaching a contrary but equally reasonable conclusion." *Id.* at 37. Defendants further maintain Commerce based its new policy on a permissible construction of the antidumping statutes and had the authority to reevaluate and change its former policy in order to implement properly the statutes. *Id.* at 36–40.

Defendants' second principal contention is that Commerce correctly refused to make a trademark-based COS adjustment for TISCO's home market price. *Id.* at 52–64. Defendants cite the preference for cost-based adjustments established by statute and regulation and approved of by case law to support Commerce's refusal to grant a *value-based*, COS adjustment for TISCO's claimed trademark premium. *Id.* at 54–57. In addition,

as emphasized by Commerce in the *Final Review*, defendants assert TISCO was unable to demonstrate the market value of the trademark according to generally accepted trademark valuation principles. *Id.* at 62. Defendants also claim TISCO failed to "demonstrate how it took the trademark into account in setting its prices and how the firm quantified the value at that time." Def.–Intrvnr.'s Br. at 38. According to defendants, comparing TISCO's home market price against the price of TISCO's home market competitors does not provide a sufficiently reliable basis upon which to grant a COS adjustment because several factors may explain price differentials apart from a trademark. Gov't.Br. at 63 (citing *Final Review*, 56 Fed.Reg. at 64,759).

Defendants' third main contention is that Commerce properly decided to exclude TISCO's home market sales of ASTM pipe in determining the company's home market price because the sales were outside the ordinary course of trade. *Id.* at 40–52. In essence, defendants argue the totality of the various factors considered by Commerce, including product use, price, sales quantity, profit margin, and production overruns, indicate TISCO's ASTM home market sales were not in the ordinary course of trade. *Id.* at 51–52. In addition, defendants maintain Commerce could properly consider each of these factors in deciding whether the ASTM home sales were in the ordinary course of trade. *Id.* at 44, 46–48.

Finally, defendants contend Commerce correctly decided to reject information that TISCO submitted during verification relating to its United States sales and use BIA. *Id.* at 64–73. Defendants assert Commerce's decision to reject the information was proper for the following reasons: (1) the time limit contained in Commerce's regulations for submitting unsolicited factual information had passed;[5] (2) the time limits that Commerce had set in its various deficiency letters lapsed before TISCO submitted complete information; and (3) TISCO's notice to Commerce regarding its omissions did not mention the

**4.** 11 CIT at 491, 666 F.Supp. at 1550.

**5.** Defendants cite 19 C.F.R. § 353.31(a)(1)(ii), (a)(3), (b)(2).

omissions from the 1987–1988 review and did not completely list the omissions from the 1988–1989 review. *Id.* at 66–70. Accordingly, defendants argue "TISCO's failure to provide Commerce with the requested information clearly constitutes *'noncompliance with an information request'* and, therefore, justifies use of the best information rule." *Id.* at 68–69 (citation omitted) (emphasis in original). Defendants also claim Commerce's choice and application of BIA were reasonable because Commerce calculated BIA from financial information contained in TISCO's annual reports and questionnaire responses and only used BIA for the company's omitted sales rather than reject the company's responses *in toto.* *Id.* at 71 (citing 19 C.F.R. § 353.37(b)).

### III. Standard of Review

In reviewing a determination made by Commerce, this Court must decide whether the determination is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed. Cir.(T) 77, 810 F.2d 1137 (1987) (citations omitted).

■ This Court must also accord substantial weight to the agency's interpretation of the statute it administers. *American Lamb Co. v. United States,* 4 Fed.Cir.(T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). "An agency's 'interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable.'" *ICC Indus., Inc. v. United States,* 5 Fed.Cir.(T) 78, 85, 812 F.2d 694, 699 (1987) (emphasis in original) (citation omitted). Where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted). The agency must not, however, "contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana,* 10 CIT at 405, 636 F.Supp. at 966 (citations omitted).

### IV. Discussion

#### A. IPRS Rebate Payments

■ The first issue before the Court is whether Commerce properly refused to make a COS adjustment to foreign market value for the IPRS rebate payments received by TISCO. For the reasons which follow, the Court finds Commerce's decision to deny TISCO a COS adjustment was reasonable and in accordance with law.

■ The ITA's authority to make COS adjustments derives from 19 U.S.C. § 1677b(a)(4) (1988). This provision indicates the following in pertinent part:

In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to

....

**(B)** other differences in circumstances of sale ...

then due allowance shall be made therefor.

19 U.S.C. § 1677b(a)(4)(B). This provision "does not define the term 'circumstances of sale' nor does it prescribe any method for determining allowances." *Smith–Corona,* 1 Fed.Cir.(T) at 137, 713 F.2d at 1575. Instead, "Congress has deferred to the expertise of the agency and vested broad discretion in it to make adjustments for the differences in the circumstances of sale." *Sawhill,* 11 CIT at 497, 666 F.Supp. at 1555 (citing *id.* at 137, 713 F.2d at 1575).

Commerce, in turn, has established guidelines by which it determines whether a foreign producer is entitled to a COS adjustment. These guidelines appear in 19 C.F.R. § 353.56 and provide as follows in relevant part:

(a) *In general.* (1) In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such differences. In general, *the Secretary will limit allowances to those circumstances which bear a direct relationship to the sales compared.*

(2) Differences in circumstance of sale for which the Secretary will make reasonable allowances normally are those involving differences in commissions, credit terms, guarantees, warranties, technical assistance, and servicing. The Secretary also will make reasonable allowances for differences in selling costs (such as advertising) incurred by the producer or reseller but normally only to the extent that such costs are assumed by the producer or reseller on behalf of the purchaser from that producer or reseller.

. . . .

(c) *Reasonable allowance.* In deciding what is a reasonable allowance for any difference in circumstances of sale, the Secretary normally will consider the cost of such difference to the producer or reseller but, if appropriate, may also consider the effect of such difference on the market value of the merchandise.

19 C.F.R. § 353.56(a)(1)–(2), (c) (1991) (emphasis added).

■ By its own terms, 19 C.F.R. § 353.-56(a)(1) limits COS adjustments to matters which are "directly related" to the sales under review. *Comitex Knitters, Ltd. v. United States,* 17 CIT ——, ——, 803 F.Supp. 410, 416 (1992) (citations omitted). This standard effectuates Congress' intent to permit COS adjustments that "are *reasonably identifiable, quantifiable,* and *directly related* to the sales under consideration and if there is clear and reasonable evidence of their existence and amount." H.R.Rep. No. 317, 96th Cong., 1st Sess. 76 (1979) (emphasis added). This Court has consistently interpreted the "directly related" standard to require importers to show the item for which

they claim a COS adjustment accounts for the differences in the prices of the sales under review. *See General Housewares Corp. v. United States,* 16 CIT ——, ——, 783 F.Supp. 1408, 1415 (1992); *Negev Phosphates,* 12 CIT at 1080–81, 699 F.Supp. at 945; *Brother Indus. v. United States,* 3 CIT 125, 129–30, 540 F.Supp. 1341, 1349 (1982), *aff'd sub nom. Smith–Corona,* 1 Fed.Cir.(T) at 130, 713 F.2d at 1568. In other words, to be entitled to a COS adjustment, an importer must demonstrate a " 'causal link' ... between the differences in circumstances of sale and the differential between United States price and foreign market value." *Smith–Corona,* 1 Fed.Cir.(T) at 138, 713 F.2d at 1577.

The application of the foregoing principles to the instant case requires a basic understanding of the IPRS scheme and the Indian domestic steel market. As explained in the *Preliminary Review,* the Indian domestic steel market functions, in part, under the control of an entity known as the Joint Planning Committee (JPC).[6] 56 Fed.Reg. at 26,-651. "The JPC sets domestic steel prices at a level considerably higher than world market prices in order to protect high-cost Indian steel producers." *Id.* In addition, "[t]he JPC assesses all Indian steel fabricators a levy on their purchases of domestic steel[,]" which the fabricators pay into the Engineering Goods Exports Assistance Fund (Exports Assistance Fund). *Id.*

Because those Indian exporters of finished steel products who buy their raw steel inputs from domestic Indian sources are placed at a comparative disadvantage with their foreign competitors, the [government of India] set up the IPRS in order to compensate those exporters for the difference between domestic and world market prices for steel.

*Id.* Once an exporter receives certification indicating it used domestically-produced steel in fabricating finished steel products for export, the government "uses monies from the [Exports Assistance Fund] to rebate to the exporter the difference between the domestic

---

6. The JPC is "a parastatal organization comprising officials of the government of India ... and representatives of the major Indian steel producers." *Preliminary Results,* 56 Fed.Reg. at 26,651.

steel price and the international steel price." *Id.* As the rebate payments offset the higher costs of using domestic steel inputs, "[t]he IPRS ... serves to neutralize the comparative disadvantage between expensive Indian steel and cheap imported steel." *Id.*

In its original antidumping duty investigation, Commerce granted TISCO a COS adjustment for the IPRS rebate payments. *Final Determination,* 51 Fed.Reg. at 9091. Commerce supported its finding, in part, by reasoning *"the IPRS rebate is directly related to, and in fact contingent upon, the export sale of the merchandise under investigation. Receipt of the IPRS effectively enhanced the net return to TISCO on those sales.* Therefore, we believe this adjustment is comparable to other circumstances of sale adjustments." *Id.* (emphasis added).

The CIT subsequently upheld Commerce's determination in *Sawhill.* 11 CIT at 500, 666 F.Supp. at 1557. There, domestic petitioners contended "the IPRS rebate is not within the class of situations that the statute, regulations, and legislative history indicate constitute circumstances of sale." *Id.* at 495, 666 F.Supp. at 1553. The Court rejected this argument and "decline[d] to adopt on the basis of *ejusdem generis* a narrow construction of the circumstances of sale provision." *Id.* at 497, 666 F.Supp. at 1555. The Court also rejected plaintiffs' position "that the export rebate is simply a straight export subsidy." *Id.* at 499, 666 F.Supp. at 1556. The Court determined the question of whether the rebates were countervailable export subsidies was not a matter for Commerce to address in an antidumping investigation. *Id.* at 499–500, 666 F.Supp. at 1557 (citing *Huffy Corp. v. United States,* 10 CIT 214, 632 F.Supp. 50 (1986)).

In this case, plaintiffs advance two main arguments to support their claim that TISCO is entitled to a COS adjustment for the IPRS rebates. First, plaintiffs argue the rebates are directly related to TISCO's United States sales and, because the company does not receive such payments for its home market sales, Commerce must allow a COS adjustment. Second, plaintiffs maintain Com-

merce's refusal to grant a COS adjustment was unreasonable, arbitrary, and capricious as Commerce had previously made an adjustment on the same facts, laws, and regulations in the original investigation.

■ The Court finds plaintiffs' arguments unpersuasive. As to plaintiffs' first contention, the Court finds nothing in the record, plaintiffs' submissions, or the authorities cited by plaintiffs that would require Commerce to conclude the IPRS payments are directly related to the sales under review within the meaning of 19 C.F.R. § 353.56(a)(1). The deficiency common in all of the items upon which plaintiffs rely is the absence of any evidence linking the IPRS rebates to TISCO's United States *price.* As indicated above, neither Commerce in its original investigation nor this Court in *Sawhill* assessed whether, *as a result of rebate monies received under the IPRS,* TISCO raised its home market price or lowered its United States price for the sales under review. While in the *Final Determination* Commerce found the rebate payments were "directly related to, and in fact contingent upon, the export sale of the merchandise under investigation" and "enhanced the net return to TISCO on [its export] sales,"[7] Commerce did not analyze whether the rebates affected TISCO's United States price. Likewise, in *Sawhill,* the Court did not assess what impact, if any, the IPRS rebates had upon TISCO's United States price. Instead, the Court considered whether the principle of statutory construction of *ejusdem generis* precluded Commerce from granting a COS adjustment for the IPRS rebates and whether Commerce improperly failed to determine whether the rebates were countervailable export subsidies that could not form the basis of a COS adjustment. *Sawhill,* 11 CIT at 496–500, 666 F.Supp. at 1554–57. Although the Court noted Commerce "is empowered to make an adjustment to [foreign market value] for the differences in costs that affect prices,"[8] the Court did not specifically decide whether TISCO's reduced costs for its ex-

7. *Final Determination,* 51 Fed.Reg. at 9091.

8. *Sawhill,* 11 CIT at 498, 666 F.Supp. at 1556.

ported merchandise translated into a lower United States price.[9]

Plaintiffs' position with respect to the IPRS rebates proceeds on the assumption that lower costs produce lower market prices. Such an assumption, however, is manifestly unfounded because a producer may decide to increase its profit margin rather than pass on the benefits of its lower input costs to consumers in the form of lower prices. *Cf. Smith–Corona*, 1 Fed.Cir.(T) at 137, 713 F.2d at 1576 ("Dumping is a prime example of unfair competition in which a foreign manufacturer ignores the normal market relationships of cost to price."). Indeed, while the Federal Circuit has endorsed the use of cost to measure COS adjustments, that court has expressly precluded Commerce from "rely[ing] on cost to *the exclusion* of its effect on value." *Id.* at 139, 713 F.2d at 1577 (emphasis in original). The facts that TISCO pays a premium for its foreign-produced inputs, receives a rebate for the premium on export, and credits the rebates as sales revenue from its export sales, do not demonstrate the rebates are "directly related" to the company's home market and United States sales within the meaning of 19 U.S.C. § 1677b(a)(4)(B) and 19 C.F.R. § 353.56(a)(1)–(2), (c). Plaintiffs have not pointed to any evidence on the record which indicates whether and to what extent the rebate affected TISCO's pricing strategy

in the foreign market and the United States. Merely because TISCO treats the rebates as sales revenue for financial accounting purposes does not demonstrate any relationship between the rebate and the *price* that TISCO established in the home and United States markets. *See Negev Phosphates*, 12 CIT at 1080–81, 699 F.Supp. at 945 (upholding Commerce's decision to deny a COS adjustment for rebate payments received as compensation for the effects of inflation and currency exchange fluctuations because the payments did not affect the importers' prices in either the home or United States market).[10] In sum, although TISCO's lower input costs may explain the company's lower United States price relative to its home market, Commerce is not required to assume such a causal relationship exists. Because plaintiffs failed to meet their burden of establishing such a relationship, the Court concludes Commerce properly refused to grant TISCO a COS adjustment for the IPRS rebates. *See Smith–Corona*, 1 Fed.Cir.(T) at 138, 713 F.2d at 1577.

■ With respect to plaintiffs' second contention pertaining to the IPRS rebates, the Court finds Commerce properly reversed its former policy of granting COS adjustments for the rebates. The mere fact that an agency reverses a policy, or a statutory or regulatory interpretation does not indicate

9. Contrary to plaintiffs' claim that the CIT "explicitly endorsed and affirmed the Department's decision [in the original investigation] and determined that the COS adjustment for IPRS was proper, appropriate, and *necessary,*" this Court finds the *Sawhill* decision did not decide whether a COS adjustment was necessary. Quite simply, *Sawhill* did not scrutinize the relationship between TISCO's lower input costs on its export sales and TISCO's selling price. Instead, the Court upheld Commerce's determination because the agency had a reasonable basis for granting a COS adjustment. In addition, none of the cases which plaintiffs argue endorse *Sawhill* supports plaintiffs' position. *See, e.g., Alhambra Foundry Co. v. United States*, 12 CIT 1110, 1115, 701 F.Supp. 221, 225 (1988) (noting the IPRS rebates at issue in *Sawhill* lowered TISCO's export prices without analyzing whether the *Sawhill* Court or Commerce found the rebates *actually* led to lower prices); *General Housewares*, 16 CIT at ——, 783 F.Supp. at 1415–16 (relying on Commerce's finding in the *Final Determination* that the IPRS rebates "effectively enhanced"

TISCO's net return on its export sales, but not discussing whether the rebates affected the company's sales price); *Negev Phosphates*, 12 CIT at 1080–81, 699 F.Supp. at 945 (contrasting the IPRS at issue in *Sawhill* which does not require manufacturers to pay anything further on its export sales with the currency scheme under review which could require further payment on export).

10. This Court expressly declines to characterize the IPRS payments as being "tied to" TISCO's export sales, rather than "directly related" to those sales. The Court observes that applying terminology such as "tied to" as short-hand for items which do not satisfy the "directly related" test, but which are somewhat related to export sales, obfuscates the inquiry required by the statutes and amplified by legislative history, regulations and case law. *Cf. Comitex Knitters*, 17 CIT at ——, 803 F.Supp. at 417 (remanding determination to Commerce in order to explain rationale for finding revenue was "tied to sales ... yet, not directly related").

the agency's decision is unreasonable, arbitrary, or capricious. It is well-settled that such reversals are entitled to deference from the courts. *Rust v. Sullivan,* 500 U.S. 173, ——, 111 S.Ct. 1759, 1769 (1991) (citing *Chevron,* 467 U.S. at 862, 104 S.Ct. at 2791). As explained in *Rust,*

> a revised interpretation deserves deference because an initial agency interpretation is not instantly carved in stone and the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis. An agency is not required to establish rules of conduct to last forever, but rather must be given ample latitude to adapt its rules and policies to the demands of changing circumstances.

*Id.,* 500 U.S. at ——, 111 S.Ct. at 1769 (quotations and citations omitted).

This Court concludes the ITA adequately justified its change of interpretation with respect to COS adjustments for the IPRS rebates with a "reasoned analysis." *Id.* 500 U.S. at ——, 111 S.Ct. at 1769 (quotation and citation omitted). Upon issuing the *Preliminary Review* and *Final Review* in this case, Commerce set forth numerous reasons supporting its decision not to grant TISCO a COS adjustment for the IPRS rebates. As previously noted, Commerce indicated it would not grant a COS adjustment because the IPRS payments (1) relate to differences in production costs rather than to differences in sales; (2) do not meet the requirements Commerce has established for granting COS adjustments; (3) are contingent upon exportation rather than upon sales; and (4) are unlike duty drawback payments that would support a COS adjustment. *Preliminary Review,* 56 Fed.Reg. at 26,651–52; *Final Review,* 56 Fed.Reg. at 64,757–58. Moreover, the Court observes Commerce first announced its decision to reconsider its policy of granting COS adjustments for revenues received pursuant to two-tiered pricing schemes, such as the IPRS, more than two and one-half years before it issued the *Preliminary Review* and ultimately reversed the policy four days before issuing the *Preliminary Review. See Light–Walled Welded Rectangular Carbon Steel Tubing from Tai-* *wan,* 53 Fed.Reg. 46,900, 46,901–02 (Dep't Comm.1988) (prelim. determ.) (announcing intent to review policy); *Light–Walled Welded Rectangular Carbon Steel Tubing from Taiwan,* 56 Fed.Reg. 26,382, 26,383 (Dep't Comm.1991) (final admin. review) (reversing policy). Because Commerce provided a comprehensive and reasoned analysis for reversing its former policy of granting COS adjustments for IPRS rebate payments and deliberated over its policy for a considerable period of time, the Court concludes Commerce's reversal is entitled to deference. *Rust,* 500 U.S. at ——, 111 S.Ct. at 1769; *cf. Metallverken Nederland B.V. v. United States,* 13 CIT 1013, 1017, 728 F.Supp. 730, 734 (1989) ("It is well settled that substantial evidence may exist in a record to support several inconsistent conclusions.") (citing *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (other citations omitted)). The reasons stated above in connection with Commerce's decision to deny TISCO a COS adjustment further reinforces this Court's conclusion that Commerce's reversal was reasonable and in accordance with law.

## B. *Trademark Premium*

The second issue before the Court is whether Commerce properly refused to make a COS adjustment to foreign market value to reflect a trademark premium allegedly realized by TISCO on its home market sales. For the reasons which follow, the Court concludes Commerce's refusal to grant a COS adjustment for TISCO's claimed trademark premium was reasonable and in accordance with law.

As noted previously, Commerce may adjust the foreign market value of merchandise under review for circumstances of sale that "are reasonably identifiable, quantifiable, and directly related to the sales under consideration and if there is clear and reasonable evidence of their existence and amount." H.R.REP. No. 317 at 381. In addition, while 19 U.S.C. § 1677b(a)(4)(B) authorizes COS adjustments, the provision "does not define the term 'circumstances of sale' nor does it prescribe any method for determining allowances." *Smith–Corona,* 1 Fed.Cir.(T) at 137,

713 F.2d at 1575. Instead, "Congress has deferred to the expertise of the agency and vested broad discretion in it to make adjustments for the differences in the circumstances of sale." *Sawhill*, 11 CIT at 497, 666 F.Supp. at 1555 (citing *id.* at 137, 713 F.2d at 1575). The deference Congress has extended to Commerce appears in the plain language of § 1677b(a)(4)(B), which limits foreign market value adjustments to circumstances of sale that a respondent has "established *to the satisfaction of the administering authority.*" 19 U.S.C. § 1677b(a)(4) (emphasis added).

With respect to a COS adjustment for a claimed trademark premium, the foregoing statutes, legislative history, and case law, clearly place the burden of quantifying the existence and effect of such a trademark premium on the respondent. These authorities also underscore the fact that Commerce has vast discretion in determining whether a respondent has met its burden. In this case, plaintiffs urge Commerce should have accounted for TISCO's trademark premium by comparing the pricing trends in the Indian market with the price charged by TISCO and by considering the product-specific profits earned by other companies with those of TISCO. Plts.' Br. at 32–35. Plaintiffs claim such a methodology is viable because "[g]enerally accepted methods of trademark valuation assume that the disparity in the rate of return for one company from the 'normal or standard' rates of return for other producers in an industry is equal to the value of a company's trademark premium." *Id.* at 32 (emphasis omitted).

■ The Court finds Commerce properly rejected TISCO's proposed methodology. As plaintiffs acknowledge in their papers, TISCO's methodology is "problematic" because it requires Commerce to analyze the product-specific profit margins of TISCO and those of the company's various competitors in the home market. *See* Plts.' Br. at 34. Even if information pertaining to the *prices* charged by TISCO's competitors were readily available, the information would not disclose the

competitors' *costs* or *profit margin*, both of which would be essential to TISCO's analysis. As a result, TISCO's methodology imposes an overly onerous burden on Commerce as it forces the agency to seek information from numerous companies that are not involved in the investigation at issue. While plaintiffs concede TISCO would be unable to obtain such "sensitive information," [11] plaintiffs have not shown and the Court fails to see how Commerce would be in any better of a position to accomplish such a task. As a result, this Court declines to impose such a responsibility on the agency. The COS statutory provision simply does not impose any requirement on Commerce to undertake information-gathering activities such as that suggested by TISCO.

In addition, even assuming TISCO's proposed methodology provides a viable means of quantifying the company's trademark premium, the Court declines to require Commerce implement the methodology in this case. As stated above, the plain language of § 1677b(a)(4)(B) and the statute's legislative history demonstrate TISCO has the burden of identifying and quantifying its claimed trademark premium. Neither the statute nor the legislative history, however, requires Commerce to obtain the information that may ultimately permit a respondent seeking a COS adjustment to satisfy its burden. Accordingly, even if TISCO's methodology would enable Commerce to quantify trademark premiums, the Court will not allow the company to transfer the bulk of its statutory obligation to the agency merely because the company developed a conceptual framework for determining such premiums' value. In sum, the Court finds TISCO failed to meet its burden of quantifying the trademark premium it claimed to have received on its home market sales. None of plaintiffs' other arguments pertaining to trademark-based COS adjustment cures the infirmity present in TISCO's methodology. As a result, the Court finds Commerce's decision to deny the company a COS adjustment for the claimed trademark premium was reasonable and in accordance with law.[12]

11. Plts.' Br. at 34.

12. The Court expressly declines to condition its findings in this case with respect to the trade-

## C. *Home Market Sales of ASTM Pipe*

The third issue before the Court is whether Commerce properly excluded TIS-CO's home market sales of ASTM pipe in calculating foreign market value. Resolution of this issue requires the Court to make a threshold determination as to whether Commerce's determination that TISCO made its ASTM sales outside the ordinary course of trade is in accordance with law. For the reasons which follow, the Court finds Commerce's finding that the sales were outside the ordinary course of trade is reasonable and in accordance with law.

The general method by which Commerce determines foreign market value appears in 19 U.S.C. § 1677b(a)(1)(A). This provision indicates the following in pertinent part:

The foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person who is not described in subsection (e)(3) of this section with respect to such person—

(A) at which *such or similar merchandise* is sold, or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual quantities and *in the ordinary course of trade for home consumption....*

19 U.S.C. § 1677b(a)(1)(A) (emphasis added); *see also* 19 C.F.R. § 353.46(b). As defined by statute, "[t]he term 'ordinary course of trade' means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15) (1988). In addition, the phrase "such or similar merchandise" contained in 19 U.S.C. § 1677b(a)(1)(A) refers to

merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16) (1988).

As indicated previously, Commerce found TISCO's home market sales of ASTM were outside the ordinary course of trade because the sales "were not normal in terms of the domestic market for standard pipe in India." *Final Review,* 56 Fed.Reg. at 64,755. Commerce reached this conclusion after considering four factors: (1) "the differences in standards and product uses between ASTM and IS pipe in the home market;" (2) the comparative volume of sales and number of buyers of ASTM and IS pipe in the home market; (3) the price and profit differentials between ASTM and IS pipe in the home market; and (4) whether the ASTM pipe

mark issue on the fact that a trademark-based COS adjustment is a "value-based" COS adjustment. Instead, the Court emphasizes the fact that the statutory-based requirements contained in 19 U.S.C. § 1677b(a)(4)(A) determine whether a COS adjustment is proper. While it may be the facts of this case exemplify the difficulty of quan-

tifying "value-based" adjustments, the Court upholds Commerce's finding with respect to the trademark-based COS adjustment because TISCO failed to meet its statutory burden and not because the adjustment it sought was "value-based."

home market sales consisted of production overruns or seconds. *Id.*

This Court must review Commerce's determinations with respect to whether an importer's sales are in the ordinary course of trade on "an individual basis taking into account all of the relevant facts of each case." *Nachi–Fujikoshi Corp. v. United States,* 16 CIT ——, ——, 798 F.Supp. 716, 719 (1992). Whether an importer has made sales in the ordinary course of trade depends on whether the importer made the sales under conditions that are normal for the product that is being sold, not whether the importer ordinarily sells the subject merchandise. *See East Chilliwack Fruit Growers Co–Operative v. United States,* 11 CIT 104, 108, 655 F.Supp. 499, 504 (1987). Commerce's decision is entitled to deference from this Court and the plaintiffs have the burden of demonstrating the sales Commerce excluded from its foreign market value calculation were *not* outside the ordinary course of trade. *Nachi–Fujikoshi,* 16 CIT at ——, 798 F.Supp. at 718–19. For the reasons which follow, the Court finds the facts and circumstances of this case indicate TISCO's home market sales of ASTM pipe were outside the ordinary course of trade and plaintiffs have failed to demonstrate otherwise.

As stated above, plaintiffs' threshold argument is that Commerce improperly used merchandise similar to ASTM pipe rather than merchandise identical to ASTM pipe to determine foreign market value. Specifically, plaintiffs urge Commerce.erred in relying on Indian Standard (IS) pipe rather than on ASTM pipe as the benchmark for assessing "the conditions and practices which ... have been normal in the trade under consideration." 19 U.S.C. § 1677(15). According to plaintiffs, Commerce generally resorts to similar merchandise only in "cases involving sample or trial sales, spot sales, sales of damaged merchandise, sales in small quantities and sales of obsolete or discontinued models." Pls.' Br. at 19 (footnotes omitted). Plaintiffs assert none of these conditions exists in the instant case and, therefore, Commerce use of IS pipe was erroneous.

Plaintiffs' position is without merit. 19 U.S.C. § 1677(16), which sets forth the categories of "such or similar merchandise" against which Commerce may compare the merchandise under review, grants Commerce broad latitude. This provision only requires Commerce to select merchandise "in respect of which a determination ... *can be satisfactorily made.*" 19 U.S.C. § 1677(16) (emphasis added). Because Commerce is charged with making the determinations to which this provision refers, the assessment of whether a determination is satisfactory lies with Commerce. As a result, even assuming the conditions cited by plaintiffs may indicate the circumstances under which Commerce will normally use similar rather than identical merchandise for ordinary course of trade and foreign market value purposes, those conditions do not limit Commerce's statutory authority under § 1677(16). Nevertheless, the record in this case clearly indicates Commerce decided to resort to similar merchandise after finding TISCO's ASTM home market sales were too sparse for a meaningful comparison. R.Doc. 42 at 785; *see also* Verification Report at 4–5. Moreover, the reasons discussed below which support Commerce's finding that TISCO's ASTM home market sales were outside the ordinary course of trade further demonstrate such sales lacked the volume and frequency that would permit Commerce to make a "satisfactory" determination of foreign market value within the meaning of 19 U.S.C. § 1677(16). In addition, because IS pipe is *the* standard in the Indian home market, the pipe provides a reasonable benchmark for ascertaining "the conditions and practices which ... have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). Accordingly, the Court finds Commerce's decision to use similar merchandise in the form of IS pipe rather than identical merchandise in the form of ASTM pipe was reasonable and in accordance with law.

Plaintiffs also contest each basis upon which Commerce found TISCO's home market sales of ASTM pipe to be outside the ordinary course of trade. With respect to the various bases considered by Commerce, plaintiffs maintain the following: (1) there is a real and bona fide demand for ASTM pipe

in the home market for use as a type of structural support, a standard use; (2) even assuming the use is not standard, the sales of the pipe, not its ultimate use, determine whether TISCO sold the product in the ordinary course of trade; (3) the low volume of home market sales of ASTM pipe relative to IS pipe does not preclude the conclusion that TISCO sells ASTM pipe in the ordinary course of trade; (4) the low profits received from home market sales of ASTM relative to IS sales are irrelevant to the ordinary course of trade issue because Commerce never found the ASTM home sales to be below cost; and (5) the ASTM home market sales were not production overrun sales, and, even if they were, the fact that Commerce used these sales in the original determination as the basis for the less than fair value comparison demonstrates the sales were not outside the ordinary course of trade.

The Court finds plaintiffs' arguments lack merit. With respect to plaintiffs' first contention that a bona fide demand for ASTM pipe exists in the home market, the Court observes that nothing on the record demonstrates whether and to what extent such a demand actually exists. To the contrary, as Commerce explained, ASTM pipe is incompatible with Indian building codes and specifications because TISCO manufactures the pipe according to United States measuring standards whereas Indian building codes and specifications employ the metric system of measurement. *Final Review,* 56 Fed.Reg. at 64,755. This discrepancy in measuring standards clearly indicates the pipe has limited application in the home market and supports Commerce's conclusion that whatever demand may exist for the pipe in India can only be marginal. As a result, even assuming the demand for ASTM pipe is bona fide, the pipe's non-conformity with Indian building standards strongly suggests the demand is numerically insignificant. *See* Pub.R.Doc. 65 at 1266 (letter from TISCO's counsel acknowledging "an overwhelming preference" for IS pipe in the Indian market). Although marginal demand for a product does not by itself indicate sales are outside the ordinary course of trade, the Court finds such a factor is probative of whether sales "have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15).

Similarly, plaintiffs' second contention with respect to product use overlooks the fact that Indian consumers' inability to use ASTM pipe in standard applications is linked to the market demand for the product. Whether a consumer in the home market can use ASTM pipe in standard applications clearly impacts upon the consumer's decision to buy the pipe and, as a result, upon sales volume. Commerce's analysis of product use is compatible with the ordinary course of trade inquiry because such an analysis explores the reasons underlying TISCO's low sales volume for ASTM pipe relative to IS pipe. Though product use may be a *condition* that explains *the fact* that TISCO has low sales volume, the condition is no less probative of "the conditions and practices which ... have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). As a result, the Court finds Commerce's consideration of product use was proper.

Plaintiffs' third contention pertaining to TISCO's sales volume is also without merit. Contrary to plaintiffs' suggestion, Commerce did not consider the fact that TISCO's sales volume for ASTM pipe was low relative to IS pipe as dispositive of the question of whether the company's home market ASTM sales were in the ordinary course of trade. *See Final Review,* 56 Fed.Reg. at 64,755. Instead, Commerce assessed the low sales volume together with "the differences in physical characteristics and product uses" of the ASTM and IS pipes. *Id.* Moreover, the record in this case convinces the Court that Commerce had a reasonable basis for finding TISCO's sales volume for ASTM pipe in the home market was low relative to IS pipe. Specifically, Commerce noted the following: (1) "the overwhelming majority of standard pipe sold in India is IS pipe, not ASTM pipe;" (2) "[c]ompared to IS pipe, ASTM pipe is sold in much smaller volumes and at a great discount;" and (3) "TISCO ... stated that only two of its many distributors in India sell ASTM pipe for resale to ... rural customers." *Id.* The foregoing points noted by Commerce clearly show TISCO's ASTM

sales volume is low both in isolation and relative to overall sales of IS pipe in India. Accordingly, the Court finds Commerce properly relied on TISCO's low sales volume as one factor in determining whether the company's ASTM home market sales were outside the ordinary course of trade.

Plaintiffs' fourth argument concerning TISCO's profits on ASTM home market sales is without merit. In short, the Court finds plaintiffs place undue reliance on the fact that Commerce never found TISCO's ASTM home sales to be below cost. Contrary to plaintiffs' position, sales do not have to be below cost in order for a profit margin to diverge from "the conditions and practices which ... have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). The Court agrees with plaintiffs that the inquiry mandated by § 1677(15) does not turn on a predetermined and fixed profit level. Nevertheless, the Court finds the language contained in § 1677(15) permits Commerce to analyze a respondent's profit level *relative to* the profits normally realized in connection with the "merchandise of the same class or kind" to which Commerce compares the respondent's merchandise.[13] Profit level is clearly one of several significant "conditions ... in the trade under consideration" within the meaning of § 1677(15). Moreover, a profit level comparison is probative of the economic reality of the trade in merchandise under review. As a result, the Court finds Commerce's comparison of profit levels between TISCO's ASTM and IS pipe sales was reasonable and in accordance with law.[14]

Plaintiffs' fifth argument relating to Commerce's characterization of TISCO's ASTM home market sales as production overruns is also unpersuasive. In the original investigation in this case, TISCO officials characterized the company's ASTM home market sales as "cost overruns." *Final Review*, 56 Fed. Reg. at 64,755; *see also* Pub.R.Doc. 64 at 1276. In the instant administrative reviews, however, plaintiffs assert such sales are not overruns and allude to several documents which plaintiffs claim substantiate their position. These documents include customer orders, factory purchase orders, production rolling schedules, warehouse dispatch documents, and ultimate sales invoices. Pls.' Br. at 27. These documents never became part of the administrative record in this case because Commerce officials received the documents either during or after verification. While plaintiffs do not squarely challenge Commerce's decision to exclude the documents from the record, the Court finds Commerce's decision was proper because TISCO did not provide the documents to Commerce in a timely fashion. *See Tianjin Mach. Import & Export Corp. v. United States*, 16 CIT ——, ——, 806 F.Supp. 1008, 1015 (1992) ("[T]he burden of creating an adequate record lies with respondents and not with Commerce."). Moreover, as "TISCO did not make available to Department officials any of its standard pipe production records and tie them to specific requests by Indian distributors for ASTM pipe,"[15] the Court finds Commerce had a reasonable basis for concluding the company's ASTM home market sales were production overruns.

13. As plaintiffs acknowledge in connection with their position regarding TISCO's claimed trademark premium, a "standard" rate of return may exist in an industry. See Plts.' Br. at 32. Yet, unlike the trademark valuation methodology proposed by TISCO which would compare the company's profits with those of its competitors, Commerce's profit analysis with respect to the ordinary course of trade issue only considers the profit differential that TISCO alone realized on its ASTM and IS pipe sales.

14. Plaintiffs' suggestion that comparing profit levels contravenes the purposes of the GATT and United States dumping laws is inapposite. Such a comparison does not penalize respondents for lowering their home market prices and profit

margins in response to a antidumping duty order. Once the United States imposes an antidumping duty margin, a respondent has several choices. For example, a respondent may decide to (1) retain its home market prices as they are; (2) lower its home market price; (3) raise its United States price; or (4) combine any of the preceding three. Clearly, lowering home market price to achieve parity with United States price is only one alternative and is not the only alternative as plaintiffs assert. Moreover, because a respondent can lower its costs in order to maintain its profit margin after lowering its home market price, lower profit levels do not have to flow from price cuts.

15. *Final Review*, 56 Fed.Reg. at 64,755.

■ Finally, the Court disagrees with plaintiffs' contention that Commerce's finding in the original investigation that TISCO's ASTM home market sales were not outside the ordinary course of trade precludes the agency from reaching an opposite conclusion in the instant administrative reviews. As Commerce indicated in the *Final Review*,

> [b]ecause TISCO was not forthcoming in the original investigation with accurate information regarding ASTM sales in India, the Department never addressed this issue. As the verification report from that investigation shows, the Department was led to believe, until verification, that it would be using sales of IS pipe, which TISCO then claimed was substantially identical to ASTM pipe, to calculate [foreign market value]. During the verification in the original investigation, TISCO officials averred that they had been operating under the impression that selling ASTM pipe was illegal in India, and had therefore reported those sales to the Department as sales of IS pipe. After the misunderstanding as to the legality of ASTM sales was cleared up, TISCO then stated verification [sic] that those sales were really ASTM pipe. It was not until the instant administrative reviews that certain facts were entered into the record that raised legitimate questions as to the [sic] whether ASTM sales in India were in the ordinary course of trade.

56 Fed.Reg. at 64,756. While TISCO officials may not have misrepresented the character of its home market sales in the original investigation, the record clearly shows the company obfuscated the differences in its sales. As a result, this Court refuses to prevent Commerce from examining the ordinary course of trade issue in these administrative reviews simply because the agency found in the original investigation the respondent made its ASTM home market sales in the ordinary course of trade.

For all of the foregoing reasons, the Court finds Commerce's determination that TISCO's home market ASTM sales were outside the ordinary course of trade is reasonable and in accordance with law. Accordingly, the Court finds Commerce properly excluded these sales in calculating foreign market value under 19 U.S.C. § 1677b(a)(1)(A).

## D. *BIA*

■ The final issue before the Court is whether Commerce properly resorted to BIA to determine TISCO's United States price. For the reasons which follow, the Court finds Commerce's use and selection of BIA was proper.

### 1. Use of BIA

The ITA's authority to use BIA in an administrative review of an antidumping duty order resides in 19 U.S.C. § 1677e. Section 1677e(b) indicates the following in pertinent part: "[i]f the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action...." 19 U.S.C. § 1677e(b) (1988). In addition, " 'whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation,' both the ITA and the International Trade Commission (ITC) are required to use 'the best information available.' " *Allied–Signal Aerospace Co. v. United States,* 11 Fed.Cir.(T) ——, ——, 996 F.2d 1185, 1190 (1993) (quoting 19 U.S.C. § 1677e(c) (1988)). Case law interpreting the BIA statutes also recognizes Commerce may use BIA when a respondent provides only partially complete answers to information requests. *Olympic Adhesives, Inc. v. United States,* 8 Fed.Cir.(T) 69, 76, 899 F.2d 1565, 1572 (1990) (citations omitted).

The record in this case clearly shows TISCO provided Commerce with incomplete and untimely submissions. First, TISCO's questionnaire response of September 25, 1988 omitted information pertaining to the company's home market sales of IS pipe despite the fact that Commerce asked the company to report all sales of the merchandise under consideration, including IS pipe. Pub.R.Doc. 42 at 785. Second, after Commerce informed TISCO of this deficiency and asked the company to provide information as to *all* of the company's IS pipe home market sales, TISCO only provided the agency with figures

representing TISCO's IS pipe sales to the Indian government. *See* Pub.R.Doc. 75 at 1376. This latter submission prompted Commerce to send a second deficiency letter apprising TISCO that it must submit information regarding all of its home market sales of IS pipe, not just those to the Indian government. *Id.* TISCO subsequently provided the information Commerce requested in its two deficiency letters. Pub.R.Doc. 18. Third, on December 7, 1990, the day on which Commerce officials were scheduled to travel to India for verification, TISCO informed Commerce of numerous, unreported United States sales covered by the 1988–1989 reviews. Confid.R.Doc. 30. These sales increased the previously reported sales by nearly 44 percent. *Id.* Finally, during verification TISCO provided Commerce officials with an additional listing reflecting several more unreported United States sales which corresponded to the 1988–1989 review and amounted to approximately 11 percent of the company's previously reported sales. *Id.* TISCO's consistent failure to provide Commerce with complete and timely submissions provided Commerce with ample reason to resort to BIA. *See Olympic Adhesives,* 8 Fed.Cir.(T) at 76, 899 F.2d at 1572.

Plaintiffs, however, emphasize the fact that TISCO voluntarily informed Commerce of its unreported sales prior to verification. Plaintiffs also maintain the sales involved amount to 1.4 percent and 4 percent of TISCO's total sales volume for the periods covered by the 1987–1988 and 1988–1989 reviews, respectively. Because of TISCO's willingness to come forth with previously omitted information and the small amount of sales involved relative to the company's total sales volume, plaintiffs urge Commerce could not properly resort to BIA.

Plaintiffs' position is meritless. The Court finds the lack of responsiveness that TISCO exhibited over the course of the administrative reviews more accurately represents TISCO's conduct than the isolated instances of cooperation cited by plaintiffs. In addition, because Commerce resorted to BIA for purposes of determining United States price, plaintiffs' argument regarding total sales volume is inapposite. The net effect of TISCO's

omissions was to increase the total volume of *United States sales* by approximately 55 percent—44 percent due to the sales that TISCO reported to Commerce on the eve of verification and 11 percent due to the sales TISCO reported during verification. As a result, TISCO's submissions were clearly incomplete. Moreover, the fact that TISCO proffered the missing information to Commerce without the agency having requested it does not alter the fact that the company produced the information approximately ten months after it had submitted its original questionnaire response for the 1988–1989 review on February 9, 1990. Even if the Court were to assume Commerce's final deficiency letters of October 10 and October 11, 1990, which sought information pertaining to TISCO's home market sales and dates of TISCO's United States sales, enabled TISCO to report new sales, the submission deadline fixed by these letters was October 26, 1990. Hence, TISCO's submissions on December 7, 1990 and one week later during verification were unquestionably late. *See* 19 C.F.R. § 353.31(b)(1), (2) (1991) (limiting the date on which a respondent may submit information specifically requested by Commerce to the date specified by Commerce); 19 C.F.R. § 353.31(a)(1)(ii) (1991) (indicating the general time limit for respondents to submit information for final results of an administrative review is the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review). Accordingly, the Court finds Commerce's decision to resort to BIA was reasonable and in accordance with law.

2. BIA Selected

■ Plaintiffs also challenge Commerce's selection of BIA. As noted above, in calculating TISCO's dumping margin in the *Final Review,* Commerce relied on "information TISCO submitted prior to verification, for U.S. sales reported in a timely fashion, and on petitioners' BIA for the unreported U.S. sales." 56 Fed.Reg. at 64,761. Petitioners had based their BIA on financial information contained in TISCO's annual reports and questionnaire responses. Conf.R.Doc. 45, Roll 3, Fr. 2711. The application of petition-

ers' BIA and the pre-verification information submitted by TISCO produced a dumping margin of 87.39 percent. *Final Review*, 56 Fed.Reg. at 64,763. Plaintiffs claim TISCO fully cooperated with Commerce during the administrative reviews and, therefore, Commerce's use of BIA which yields a punitive dumping margin was improper.

▮ Plaintiffs' position is unpersuasive. As discussed previously, TISCO was clearly uncooperative during the administrative reviews. Under its own regulations and applicable case law, Commerce may properly consider a respondent's lack of cooperation in determining what constitutes BIA. *Allied–Signal*, 11 Fed.Cir.(T) at ——, 996 F.2d at 1190; *see also* 19 C.F.R. § 353.37(b) (1991) ("If an interested party refuses to provide factual information requested by the Secretary or otherwise impedes the proceeding, the Secretary may take that into account in determining what is the best information available."). Moreover, because the BIA that Commerce selected derived from petitioners' submissions, Commerce's selection conformed to the agency's regulations. *See* 19 C.F.R. § 353.37 ("The best information available may include the factual information submitted in support of the petition or *subsequently submitted by interested parties* ....") (emphasis added).

In addition, the mere fact that the BIA selected results in a high dumping margin does not, as plaintiffs suggest, indicate the information adopted as BIA is punitive. *Cf. Rhone Poulenc, Inc. v. United States*, 8 Fed. Cir.(T) 61, 67, 899 F.2d 1185, 1190 (1990) ("In order for the agency's application of the best information rule to be properly characterized as 'punitive,' the agency would have had to reject low margin information in favor of high margin information that was demonstrably less probative of current conditions."). In short, nothing on the record indicates the margin based on petitioners' BIA is "less probative of current conditions" than information supplied by TISCO. Accordingly, the Court finds plaintiffs have failed to show the margin determined by Commerce is punitive. *See id.* at 67, 899 F.2d at 1190.

**16.** *See* Conf.R.Doc. 45, Roll 3, Fr. 2711.

This Court must accord deference to Commerce's determination of what constitutes the best information available in a particular case. *Allied–Signal*, 11 Fed.Cir.(T) at ——, 996 F.2d at 1191 (citing *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–83). This Court will uphold Commerce's BIA determination so long as record evidence demonstrates "a rational relationship between [the] data chosen and the matter to which they are to apply." *Manifattura Emmepi S.p.A. v. United States*, 16 CIT ——, ——, 799 F.Supp. 110, 115 (1992). Because petitioners' BIA relies on financial information contained in TISCO's annual reports and questionnaire responses,[16] the BIA is clearly probative of the company's activities in the United States and, therefore, bears a rational relationship to TISCO's unreported United States sales. As a result, the Court finds Commerce correctly relied on petitioners' submissions as BIA.

### V. Conclusion

After considering all of plaintiffs' arguments, the Court makes the following holdings: (1) Commerce's refusal to make a COS adjustment to foreign market value for the IPRS rebate payments received by TISCO is supported by substantial evidence on the record and is otherwise in accordance with law; (2) Commerce's refusal to make a COS adjustment to foreign market value to reflect a trademark premium allegedly realized by TISCO from its home market sales is supported by substantial evidence on the record and is otherwise in accordance with law; (3) Commerce's decision to exclude TISCO's home market sales of ASTM pipe in calculating foreign market value is supported by substantial evidence on the record and is otherwise in accordance with law; and (4) Commerce's selection of BIA in determining TISCO's United States price is supported by substantial evidence on the record and is otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B). Therefore, the *Final Review* is sustained and plaintiffs' motion for judgment upon the agency record is denied.

## ORDER

This case having been duly submitted for decision, and the Court after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

**ORDERED** that plaintiffs' motion is denied; and it is further

**ORDERED** that the Department of Commerce's determination in *Certain Welded Carbon Steel Standard Pipes and Tubes From India,* 56 Fed.Reg. 64,753 (Dep't Comm.1991) (final admin. review) is sustained; and it is further

**ORDERED** that this action is dismissed.