Slip Op. 02 - 148

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| AUSIMONT SPA and AUSIMONT USA, | : | |
| | : | |
| Plaintiffs, | : | **PUBLIC VERSION** |
| | : | |
| v | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| THE UNITED STATES, | : | Court No. 98-10-03063 |
| | : | |
| Defendant, | : | |
| | : | |
| E.I. DUPONT DE NEMOURS, | : | |
| | : | |
| Defendant-Intervenor. | : | |
| | : | |

[Plaintiffs' motion for further remand of results of redetermination to the Department of Commerce denied; remand results sustained.]

Decided: December 17, 2002

*MRC Inc.* (*John Hoellen*), Washington, D.C., for plaintiffs.

*Robert D. McCallum, Jr.*, Assistant Attorney General, *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Lucius B. Lau*), for defendant.

*Wilmer Cutler & Pickering* (*Ronald I. Meltzer, John D. Greenwald, Francesca E. Bignami*, and *Christopher J. Kent*), Washington, D.C., for defendant-intervenor.

## OPINION

This opinion examines Commerce's remand results following *Ausimont SpA v. United States*, Slip Op. 01-92 (2001).[1] The issue is whether certain home market sales of wet reactor bead were made in the "ordinary course of trade," defined by statute to mean "the conditions and practices

---

[1] Familiarity with the prior opinion including abbreviations therein is presumed.

which, for a reasonable period of time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind."[2] 19 U.S.C. § 1677(15). Since there were no other home market sales of wet reactor bead that could serve as a basis for comparison, and due to inconsistency in comparing the contested sales with granular PTFE resin sales, Commerce was ordered to reconsider, without limitation: (1) the contested sales *qua* wet reactor bead, not as a model of granular PTFE resin; (2) relative volume and frequency, and aggregate comparisons of quantity, price, and profit, or such other methodology as Commerce might determine was more appropriate; (3) the market for wet reactor bead in Italy; and (4) the differences between the terms and conditions of wet reactor bead sales and granular PTFE resin sales in Italy based on the verified documentation.

The *Remand Results* state that: (a) wet reactor bead and granular PTFE resin are within the "same class or kind" of merchandise and therefore are comparable product types for purposes of an ordinary course of trade determination; (b) a model-specific comparison of wet reactor bead sales to the sales of other PTFE resin models is reasonable, and re-examination of volume, frequency, quantity, profit, price, and market demand, do not indicate that the wet reactor bead sales are outside the ordinary course of trade; (c) the record does not support the conclusion that the contested sales were not made in normal commercial quantities; (d) the terms and conditions of sales for wet reactor bead are not unusual. Specifically, Commerce determined as follows.

---

[2] *See* Pub. L. 103-465 § 222(h), 108 Stat. 4809 (substituting "subject merchandise" for "merchandise which is the subject of this investigation"). *See also* H.R. Rep. No. 826(I) at 65 (1994), *reprinted in 1995 U.S.C.C.A.N.* 3773 ("What formerly was referred to as 'class or kind' of merchandise subject to investigation or covered by an order is now referred to simply as the 'subject merchandise.'").

Total quantity. Commerce divided all PTFE sales under review into five intervals: (1) below 10,000 kilograms; (2) 10,000 to 19,999 kilograms; (3) 20,000 to 29,999 kilograms; (4) 30,000 to 39,999 kilograms; and (5) 40,000 and higher kilograms. These categories amounted to 72.55 percent, 7.84 percent, 5.88 percent, 1.96 percent, and 11.76 percent, respectively, of total PTFE sales included in the analysis. The total volume of the contested sales was greater than [ ] percent of granular PTFE resin sales, *i.e.* about [ ] percent of the remaining individual granular PTFE models were sold in higher quantities. Commerce therefore found the contested sales volume to be significant in comparison with individual PTFE resin product sales volumes. *Remand Results* at 5-6.

Average quantity. Commerce found that average quantity of PTFE resin product sales varies from model to model, irrespective of sales frequency. *Id*. at 6. Average quantity ranged from [ ] kilograms for product code 380879 to [ ] kilograms for product code 380127 for the same number of transactions. The average volume for the contested sales was [ ] kilograms, higher than the average volume of any other PTFE resin product, which Commerce determined was not "significantly" higher than the average volume of product code 380127, the transactions in which ranged from [ ] percent to [ ] percent of the volume of the contested sales. Commerce reasoned that the "large differences in the average volume among the individual models of PTFE resin supports the fact that the average volume of wet reactor bead, while higher than the average volumes of sales of PTFE resin models, is consistent with the pattern of variations in the average volume among the different models." *Id*.

Frequency. The range of frequencies for each product varied from [ ] to [ ] transactions. Commerce found "no correlation between the number of transactions and the quantity sold" since

wet reactor bead "is sold at least as frequently as [ ] percent of the individual models sold during the POR[.]" Commerce therefore found the frequency of wet reactor bead sales to be not unique or unusual compared to the frequency of several other PTFE resin models sales. *Id*. at 6-7.

Profit. The profit rates for PTFE resin products ranged from [ ] percent to [ ] percent, including five PTFE resin models that exceeded the [ ] percent profit rate for wet reactor bead sales. The profit margin for product code 380294 differed from that for the contested sales by less than one percent. Seven other PTFE products had profits ranging from [ ] to [ ] percent. Commerce therefore concluded that the profit rate for wet reactor bead was not unusual when compared to the profit rates for these PTFE models. *Id*.

Price. Commerce compared the weighted-average price of wet reactor bead sales to those of the individual models PTFE resin models and found that "the price ratios of wet reactor bead to PTFE resin are between [ ] and [ ] percent of approximately [ ] percent of the total PTFE resin models sold during the POR." *Id*. at 7-8. In particular, Commerce noted that the average price of PTFE resin product code 380127 is just below the average price for wet reactor bead. Thus, the agency found that "the average price for wet reactor bead approximates the average price for several other PTFE resin models[.]" *Id*. at 8.

Usual commercial quantities. Commerce rejected Ausimont's "usual commercial quantities" claim, *see* 19 U.S.C. § 1677b(a)(1)(B)(i), because it determined that the total and the average quantities of wet reactor bead sales were within the normal range of the total and average quantities and average price for sales of product code 380127. *Id*.

Number of customers.  [   ] percent of the individual PTFE resin models were sold to one customer only.  Commerce therefore found the fact that the contested sales had been sold to a single customer not unusual.  *Id.*

Market.  On whether there is a "market" for wet reactor bead, Commerce stated that its prior statement in circumvention proceeding that there was "virtually no market" for wet reactor bead is "meaningless" since that factor was determined in conjunction with other ordinary course of trade factors but it acknowledged that the *Final Results* "should have focused primarily on the facts presented in the review at issue[,] not historical information from prior review periods, in which ordinary course of trade regarding wet reactor bead sales in the home market was not an issue[.]"[3] Commerce then went on to conclude that "independent of prior determinations . . . the evidence before it sufficiently merits the finding of a market." *Id.* at 9.  Specifically, it relied on the fact that the frequency of the contested sales to a single customer was equal to or greater than [   ] percent of other PTFE resin models.

Terms of Sale.  Commerce found that the terms of sale for wet reactor bead were not unusual because, although Ausimont claimed they were negotiated separately between Ausimont and the single purchaser, this was not brought to Commerce's attention during verification and there is no

---

[3]  In response to the Court's request to clarify its statement from the prior anti-circumvention proceeding that there was "virtually no market" for wet reactor bead, Commerce responds that it would be inappropriate to compare Commerce's determination in the anti-circumvention proceeding with its finding in the instant matter because the anti-circumvention proceeding "was not intended to examine the issue of whether certain sales are outside the ordinary course of trade, but rather discuss particular scope issues." *Remand Results* at 9.  Commerce explains that its comment was intended in reference to the U.S. market, not the foreign market, and that referencing prior segments of the proceeding was merely intended to dispute Ausimont's contention that the contested sales were outside the ordinary course of trade because there were no reported sales of such products in the immediately preceding review. *Id.*

record evidence showing that such negotiations were peculiar to wet reactor bead. *Id.* at 12, referencing R.Doc 576 (Ausimont's December 19, 1997 response) at A-12 ("[t]here are no published price lists in Italy"), A-6 (prices for PTFE resin "are negotiated on a case-by-case basis with individual customers"). Ausimont also argued that because wet reactor bead was purchased on a "pending order" basis (meaning that Ausimont could cancel the order if it could not fill it by the target date), this distinguished it from granular PTFE resin sales, however Commerce determined that "open order" sales of granular PTFE resin, whereby the customer would periodically inform of the amount desired and Ausimont would ship product at the then-prevailing price, meant that such sales were similar to the term for wet reactor bead: both instances were not a commitment to purchase a particular quantity at a set price. *Id.*

Considering these factors individually and under a "totality of the circumstances" as a whole, Commerce determined that foregoing factors supported finding that the contested sales were not made outside the ordinary course of trade. *Id.* at 8.

### *Discussion*

The standard of review on remand results remains whether the agency's determination is "unsupported by substantial evidence on the record, or is otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).[4]

---

[4] "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Cop. v. NLRB*, 305 U.S. 197, 229 (1938) (citation omitted). The Supreme Court has further stated that under the substantial evidence standard "[a] court reviewing an *agency's* adjudicative action should accept the agency's factual findings if those findings are supported by substantial evidence on the record as a whole. . . . The court should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 113

(continued...)

A.

The *Remand Results* conclude that the two product types are comparable (1) because the circumvention proceeding determined that wet reactor bead is subject to the antidumping duty order and in accordance with the circumvention proceeding is differentiated from granular PTFE resin only by a small difference in value and a relatively uncomplicated process of further manufacture and (2) because declining to compare wet reactor bead and granular PTFE resin "would exaggerate the small difference in value and the complexity of processing between wet reactor bead and PTFE resin[.]" Therefore, Commerce reiterated that wet reactor bead is a model "of the same class or kind" of merchandise for purposes of ordinary course of trade analysis and concluded that "wet reactor bead is one of the numerous unique products, within a class of PTFE products, that reflects unique characteristics and intended applications, as is the case with the other PTFE resin models." *Remand Results* at 4. *See* 19 U.S.C. § 1677(15). *See also Granular Polytetrafluoroethylene Resin From*

---

[4] (...continued)
(1992) (emphasis in original; citation omitted). *See also Consolo v. Federal Maritime Commission*, 373 U.S. 607, 620 (1966) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's finding from being supported by substantial evidence."); *Inland Steel Industries, Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999) (reviewing courts do not weigh the evidence to determine whether a different conclusion is possible); *Matsushita Elec. Industries Co. v. United States*, 730 F.2d 927 (Fed. Cir. 1984) (" It is not the court's function to decide that it would have made another decision on the basis of the evidence.")*; FAG Kugelfischer v. United States*, 932 F. Supp. 315, 317 (CIT 1996), *quoting Timken Co. v. United States*, 699 F. Supp. 300, 306 (CIT 1988), aff'd 894 F.2d 385 (Fed. Cir. 1990) ("It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record."). But, substantial evidence supporting an agency determination must be based on the whole record, a reviewing court must take into account not only that which supports the agency's conclusion, but also "whatever in the record fairly detracts from its weight." *Melex USA, Inc. v. United States*, 19 CIT 1130, 1132, 899 F. Supp. 632, 635 (1995) (citing *Universal Camera corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

*Italy; Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 Fed. Reg. 26100, 21002 (Apr. 30, 1993).

In general, Ausimont argues that the differences between wet reactor bead and granular PTFE resin outweigh their similarities but that Commerce has ignored the order to regard wet reactor bead for its own sake, *qua* wet reactor bead, and not as a model of granular PTFE resin. It contends that the circumvention proceeding did not specifically determine that wet reactor bead is of the same "class or kind" of merchandise as granular PTFE resin but determined only that the value added from processing wet reactor bead into granular PTFE is small relative to the cost of manufacturing wet reactor bead in Italy, and also that the United States further-manufacturing process was not complex relative to the process required to produce wet reactor bead. Ausimont further argues that Commerce departed from its "routine" practice of considering the differences in the intended uses of the products, the ultimate expectations of the purchasers, the physical characteristics of the products under comparison, and the manner in which the products are advertised, in reaching the remand results at issue. Pl.s' Br. at 10-13 referencing *Laclede Steel Co. v. United States*, 19 CIT 1076 (1995).

The government and DuPont contend that "class or kind" distinctions are not required, that Commerce has complied with the Court's order, and/or that Ausimont is attempting to re-litigate the circumvention determination. They argue that consideration on remand of the factors Ausimont advocates was unnecessary because 19 U.S.C. § 1677(15) only requires consideration of the "conditions and practices" of the "same class or kind" of merchandise, and the *Remand Results* state that granular PTFE products vary widely by composition and intended application and are generally

not interchangeable yet Ausimont did not argue that such products are not comparable. *Remand Results* at 3-4

The circumvention proceeding under 19 U.S.C. § 1677j settled the issue of whether wet reactor bead is of the same "class or kind" of merchandise subject to the outstanding antidumping order on granular PTFE resin. In general, a question on the "class or kind" of merchandise subject to an outstanding order is an issue of fact for resolution by Commerce, in consultation as necessary with the U.S. International Trade Commission. *See* 19 C.F.R. § 351.225. In a typical "other" scope proceeding, when the question cannot be resolved based on the four corners of the petition, Commerce will consider the physical characteristics of the product, the expectations of the ultimate purchasers, the ultimate use of the product, the channels of trade in which the product is sold, and the manner in which the product is advertised or displayed. 19 C.F.R. § 351.225(k). Consideration of these criteria were approved in *Diversified Prods. Corp. v. United States*, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983). By contrast, a section 1677j circumvention proceeding is a "clarification or interpretation" of an outstanding order to include products that may not fall within the order's literal scope. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998). *See Granular Polytetrafluoroethylene Resin From Italy: Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 Fed. Reg. 26100, 26102 (Apr. 30, 1993). Inclusion of wet reactor bead within the ambit of the antidumping order resulted from the agency's determination that merchandise sold in the United States (granular PTFE resin) that had been "completed" from imported "parts or components" (wet reactor bead) is of the "same class or kind" of merchandise that is the subject of an antidumping or counterveiling duty order or finding (granular PTFE resin). *See* 19 U.S.C. §

1677j; 19 C.F.R. § 351.225(g). Each antidumping duty order is intended to cover a single "class or kind" of "subject merchandise."[5] *See* 19 U.S.C. § 1677(25). Commerce thus interprets the effect of an affirmative circumvention determination as rendering "parts or components" *ipsi dixit* the same "class or kind" of merchandise as the completed merchandise. *See, e.g., Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta From Italy: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 63 Fed. Reg. 54672, 54673 (Oct. 13, 1998) ("the statute regards the components subject to the finding of circumvention as, in effect, imports of the subject merchandise, rather than components, *per se*."); *Initiation of Anticircumvention Inquiry on Antidumping and Countervailing Duty Orders on Hot-Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom and Germany*, 62 Fed. Reg. 34213, 34215 (Jun. 25, 1997) ("an affirmative finding of circumvention treats the parts and components as constructively assembled into subject merchandise at the time of import"). Thus, to interpret wet reactor bead as being part of the same "class or kind" of merchandise as granular TPFE resin as a result of the circumvention proceeding is a logical construction of the statutory scheme.

However, the Court disagrees that Ausimont's argument is attempting to re-litigate that proceeding, and it further disagrees that categories of the "class or kind" may not be legally required. The statutory definition of "foreign like product" is predicated on categories of increasingly dissimilar product attributes, *see* 19 U.S.C. § 1677(16),[6] and a product's use and physical

---

[5] For example, the *Antifriction Bearings* cases involve separate investigation numbers and antidumping duty orders on each "class or kind" of antifriction bearing (*e.g.*, CRBs, SPBs, *et cetera*).

[6] "Foreign like product" means, in descending order of preference, (1) "identical" merchandise, (2) "like" merchandise that is of approximately equal commercial value, component

(continued...)

characteristics are mandatory considerations that permeate the statutory scheme.[7] The fact the products are of the "same class or kind" does not mean, *ergo*, that the products are comparable for purposes of the ordinary course of trade analysis. That fact alone is irrelevant, because the ordinary course of trade analysis always concerns sales of the same class or kind of merchandise, *see* 19 U.S.C. § 1677(15), which, Commerce acknowledges, can encompass dissimilar products types. The remand order did not compel the creation of distinct categories but left it to the parties to attempt to resolve the proper treatment of the issue, but the Court's opinion did acknowledge the obvious fact that the attributes of wet reactor bead and granular PTFE resin make them distinct products. Cement and clinker have been determined to constitute the same "class or kind" but different "such or similar" categories because of different product uses, *see Calcium Aluminate Cement, Cement Clinker and Flux From France*, 59 Fed. Reg. 14136, 14141 (Mar. 25, 1994), and wet reactor bead

---

[6] (...continued) material, and use, and is produced by the same person and in the same country, or (3) "like" merchandise that is of the "same general class or kind" and use, and is produced by the same person and in the same country. 19 U.S.C. § 1677(16).

[7] *Compare* 19 U.S.C. § 1677(10) (the "domestic like product" that is harmed by dumping is predicated on determining which product(s) are "like" or "most similar" to the "article subject to an investigation" based on physical characteristics and "uses") *with* 19 U.S.C. § 1677(16)(B) & (C) (administering authority is required to consider "the purposes for which used" with respect to non-identical "foreign like product" determinations). *See also Carlisle Tire & Rubber Co., Div. of Carlisle Corp. v. United States*, 9 CIT 520, 622 F. Supp. 1071 (1985) ("purposes for which used" required comparison of tubes for passenger cars with tubes for other passenger cars and not with tubes for trucks or farm vehicles). *See also*, *e.g.*, *Malleable Cast Iron Pipe Fittings, Other than Grooved, from Brazil*, 51 Fed. Reg. 10897 (March 31, 1986) (Comment 1) (interchangeability of pipe). *Cf. Certain Forged Steel Crankshafts From the United Kingdom*, 52 Fed. Reg. 32951, (Sep. 1, 1987) (Final LTFV Determ.) (Comment 1) (no well-established designations for types of merchandise in the crankshaft industry distinguishes product "use"). To the extent that "other" scope determinations "will consider" differences/similarities in physical product characteristics and uses, among other factors, 19 C.F.R. § 351.225(k) is a mere restatement of the obvious.

is to granular PTFE resin as clinker is to cement. *See* Slip Op. 01-92 at 16, 38. In any case, it is the underlying data that legally control the propriety of a chosen methodology, not the other way around. *See* Slip Op 01-92 at 39 ("sales must be examined for what they are, whether or not there is formal division into . . . product categories"). The government and DuPont resist the idea that so-called *Diversified Products* criteria are applicable to "class or kind" categories or ordinary course of trade analyses, but the "totality of the circumstances" standard controls the latter, and the circumstances of a given case may *require* consideration of such criteria. *Cf. Laclede Steel Co., supra*, 19 CIT at 1080 (considering *inter alia* that overrun and commercial pipe differ in terms of end use and lack of assurance to customers that overrun pipe meets industry specifications);[8] *Mantex, Inc. v. United States*, 17 CIT 1385, 1405, 841 F. Supp. 1290, 1307 (1993) (approving analysis of differences in uses of ASTM pipe and Indian Standard pipe as one of the key factors for finding ASTM pipe sales in the home market to have been made outside the ordinary course of trade); *Lightweight Polyester Filament Fabric From Japan*, 49 Fed. Reg. 472, 476 (Jan. 4, 1984) (Final LTFV Determ.) (Comment 3) (suitability of certain semi-finished over finished fabrics for use in garments). *Cf. also In the Matter of Live Swine From Canada*, Secretariat File No. USA-94-1904-01 (U.S.-Canada Binational Panel Decision) (May 30, 1995) ("Commerce does not point to anything to support [its] . . . reading of the congressional intent, *i.e.*, that subclasses are permitted but that the Diversified Products test is not an appropriate methodology for their creation.").

---

[8] DuPont characterizes *Laclede* as concerned only with end use. It is apparent, however, that Commerce touched upon other *Diversified Products* criteria, directly or indirectly, among other factors also considered. *See* 19 CIT at 1080.

Commerce has discretion over the method of analyzing ordinary course of trade claims, but the exercise of that discretion must abide by well-established principles of administrative law. Commerce must be consistent in its analyses and it must not ignore relevant data. *E.g.*, *RHP Bearings, Ltd. v. United States*, 288 F.3d 1334 (Fed. Cir. 2002); *Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir. 1997); *D&L Supply Co. v. United States*, 113 F.3d 1220 (Fed. Cir. 1997). *Cf. Laclede*, *supra*. It is fundamental that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manuf. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983), quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). *See also Manifattura Emeppi S.p.A. v. United States*, 16 CIT 619, 624, 799 F. Supp. 110, 115 (1992) (selection of "best information otherwise available is subject to a rational relationship between data chosen and the matter to which they are to apply"). On review thereof, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 285 (1975).

Nonetheless, a determination of "less than ideal clarity" may be upheld "if the agency's path may be reasonably discerned." *Id.* at 286. Here, Commerce determined that inferences are possible from comparisons of wet reactor bead and granular PTFE resin sales because the circumvention proceeding determined that the products are of comparable value and of relative manufacturing complexity. At the same time, Commerce acknowledged that the products are different, since it granted a difference in merchandise adjustment, implying that wet reactor bead is "similar" to

granular PTFE resin but has "commercially significant" differences. *See Pasquera Mares Austreles Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001). Commerce's reliance on the significance of the variation among granular PTFE resin products in composition and uses and in the fact that they are generally not interchangeable[9] to support its argument that wet reactor bead and granular PTFE resin are comparable does not address the degrees of association between the attributes of the *semi*-finished product versus the *further*-finished products, and Commerce does not otherwise comment on wet reactor bead use[10] except to note "the wide range of models and intended applications with the PTFE class of products" *as a whole. Remand Results* at 3. It is therefore arguable that the written results of remand are deficient in this respect. But, in the final analysis, it is apparent that Commerce was aware of Ausimont's points and considered them. *See, e.g.*, *id*. 3 ("[n]otwithstanding Ausimont's contention that because wet reactor bead varies so significantly in physical characteristics and application from PTFE resin that it should be considered a distinct product, . . . ."). Commerce essentially concluded that the qualitative differences between the two types of products did not outweigh their commonalities ("wet reactor bead is one of the numerous

---

[9] Commerce observed that granular PTFE resin is used to produce "marketable shapes and forms" that "vary significantly" depending upon the production process. *See Remand Results* at 3 (citations omitted). Granular PTFE resin can be unfilled (virgin) or filled with glass, carbon, graphite, non-oxidized bronze, ceramics, super-conductive carbon, alumina, calcium fluoride, stainless steel, nickel, pigments, and polymer. Within each product category of virgin and filled PTFE resins there is a "wide range" of different types and grades with mechanical, chemical, and electrical characteristics and applications. The uses of granular PTFE resin thus extend across automotive, aerospace, electronics, chemical production, food, refrigeration, and construction industries, and include hook-up wires, coaxial cables, interconnecting wiring, aerospace and automotive connectors, seals, piston rings, bushing, slide bearings, and tapes. *Id.*

[10] Ausimont states that wet reactor bead is used to produce not only granular PTFE resin but also lubricant powders not within the current scope of the antidumping order. Pl.s' Br. at 11.

unique products, within a class of PTFE products, that reflects unique characteristics and intended

applications, as is the case with the other PTFE resin models") and that therefore wet reactor bead

and granular PTFE resin are comparable products for purposes of an ordinary course of trade

analysis. Taken as a whole, the Court is unable to conclude that the *Remand Results* do not reflect

a "rational connection between the facts found and the choice made." Ausimont's arguments with

respect to product use, purchaser expectation, differing physical characteristics, manner in which

advertised, *et cetera*, do not demonstrate, as a matter of fact, that wet reactor bead and granular PTFE

resin are *not* comparable products for purposes of an ordinary course of trade analysis or that

Commerce's conclusion was unreasonable or unsupported by substantial evidence on the record.[11]

The Court is not free to substitute judgment on the issue. *See supra*, note 4.

B.

Because of the "wide" variations in characteristics and applications, Commerce states that

it had to undertake a "model specific" analysis of the contested sales. In general, Ausimont criticizes

Commerce for analyzing each of the quantitative factors by comparing the wet reactor bead sales to

data points picked from the entire range of granular PTFE resin sales instead of what is typical or

normal within that range of data. Ausimont argues that Commerce's "established" ordinary-course-

of-trade practice is to compare contested sales to the remaining sales in the aggregate and that

Commerce has provided no explanation for why departing from this practice "would exaggerate the

small difference in value and the complexity of processing between wet reactor bead and PTFE

---

[11] Ausimont did not provide Commerce with statistical or other proofs that might have supported its position. A chi-squared distribution, for example, might have been an appropriate test of the null hypothesis given the circumstances at issue.

resin." If wet reactor bead sales had been analyzed in the context of granular PTFE resin sales as a whole, Ausimont contends, the issue of whether or not they are a "model" of granular PTFE resin is rendered irrelevant. Ausimont further argues that if Commerce's logic was valid, it would follow this professed "model-specific" approach in every ordinary course of trade situation, whereas, according to Ausimont, Commerce's policy is exactly the opposite.[12]

However, the order of remand did not prohibit the use of an "individual model" methodology, and Commerce explained that the variation in kinds and number of products constituting the "class

---

[12] Pl.s' Br. at 5-10, referencing *CEMEX S.A. v. United States*, 19 CIT 587 (1995), *aff'd after remand results sustained* 133 F.3d 897 (Fed. Cir. 1998); *Mantex*, *supra*, 17 CIT 1385, 841 F.Supp. 1290; *Laclede Steel Co. v. United States*, 18 CIT 965 (1994), *on remand*, *supra,* 19 CIT 1076; *Gray Portland Cement and Cement Clinker from Mexico*, 64 Fed. Reg. 13148 (Mar. 17, 1999) (Aug. 31, 1998 Mem. at 4); *Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 61 Fed. Reg. 1328 (Jan. 19, 1996) (Final Rev. Results); *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 57 Fed. Reg. 42942 (Sep. 17, 1992) (Final LTFV Determ.). *Cf. Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27359 (May 19, 1997) (Final Rule) (use of data on varied groups of models for determining constructed value profit would add additional complexity without generating additional accuracy). Ausimont draws particular attention to *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 66 Fed. Reg. 18747 (Apr. 11, 2001) (Final Rev. Results) in which Commerce recently stated:

> We find an examination of individual overrun sales within the pool inappropriate. First, both the Act and the Statement of Administrative Action ("SAA") contemplate an analysis of groups of sales which differ from most sales under consideration. The Act requires an examination of "conditions and practices." This language implies an examination of groups of sales, rather than individual transactions. This understanding is clarified by the SAA, which refers to types of transactions Commerce may consider to be outside the ordinary course of trade. Specifically, the SAA states: "Commerce may consider other *types* of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary when compared to sales of transactions *generally* made in the same market." SAA at 165 (emphasis added).

Analysis of Overrun Sales for Hyundai Pipe Co., Ltd. (Apr. 5, 2001) at 7-8.

or kind" justified the approach taken. The Court cannot conclude that this was unreasonable or that it was in error for Commerce to have utilized an individual model approach, even assuming *arguendo* the existence of administrative practice in this area. *See American Silicon Technologies v. United States*, 19 CIT 776, 777, 19 F. Supp. 2d 1121, 1123 (1998) ("[i]t is a general rule that an agency must either conform itself to its prior decisions or explain the reason for its departure.").

Turning to the specific factors considered, Ausimont argues that Commerce's use of "total quantity"[13] is also contrary to agency practice, which is to examine relative sales volume and frequency. *See Gray Portland Cement and Clinker From Mexico*, 65 Fed. Reg. 13943 (Mar. 15, 2000) (Final Rev. Results).[14] Under the new concept, all but one of the models relied on by Commerce to support its decision would have the lowest or near the lowest total quantities of all models under review. If "total quantity" is a valid analytical tool, Ausimont argues, then to be consistent Commerce should have excluded those models too, but the reason Commerce did not do

---

[13] Although Commerce is now using the term "total quantity" rather than "absolute volume," the concepts appear to be the same.

[14] In the decision memorandum incorporated by reference in that decision, Commerce described its history of using relative sales volume as an important factor in its ordinary-course-of-trade analysis before concluding that "it has been our long-standing practice to consider the relative sales volume, along with other factors, in our ordinary-course-of-trade analysis." *Gray Portland Cement and Clinker From* Mexico, 65 Fed. Reg. 13943 (Issues and Decision Memorandum at 13). Ausimont repeats its argument (*see* Slip Op. 01-92 at 16-18) that the long series of *Gray Portland Cement and Clinker From Mexico* decisions stand not only for the proposition that it is Commerce's longstanding practice to consider relative sales volume and frequency, but to accord great weight to those factors. Pls.' Br. at 20, referencing Issues and Decision Memorandum, *id.*, at 12-13 (sales volume, *i.e.* number of transactions and quantity sold, was enough by itself to show that the sales in question were unusual). In the same case, Commerce also rejected the suggestion that it substitute the factor of "absolute volume" for "relative sales volume." *See also Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 66 Fed. Reg. 18747 (Apr. 11, 2001) (Final Rev. Results) (Analysis of Overrun Pipe for Hyundai Pipe Co., Ltd. at 8) (absolute volume provided "no meaningful insight into demand for overrun pipe").

so is because it is required to examine the totality of the circumstances, not just a few factors in isolation, and the proper context of that consideration is that sales of granular PTFE resin are regularly made in the Italian market but sales of wet reactor bead are not. Ausimont further argues that the analysis presupposes that sales of all of the referenced models were made in the ordinary course of trade because Ausimont did not request that certain of them be excluded. Ausimont again argues (*see* Slip Op. 01-92 at 19 n.17) that on its own volition Commerce excluded sales of product code 380550 as "off-spec" and that these were in greater absolute amount, total volume, frequency, and of lower average quantity than the contested sales. Ausimont argues that these circumstances only corroborate that product code 380550 sales are not "representative" of Ausimont's "normal" sales. Ausimont further contends that if Commerce insists on analyzing wet reactor bead as a model of granular PTFE resin then it would have to treat it as an "off-spec" product because wet reactor bead cannot be used for the same purposes as regular, commercial granular PTFE resin.

Regarding average quantity, Commerce acknowledged that the average volume quantity of the wet reactor bead sales was higher than any other granular PTFE resin models but determined that it was "not significantly higher" than the average volume for product code 380127. *Remand Results* at 6. Ausimont asserts that Commerce did not actually consider a comparison of the average quantities of wet reactor bead and product code 380127 but compared highest to lowest sales. Ausimont argues that the average quantity for the contested sales is almost 32 percent higher, a difference that Commerce implicitly found to be "not significantly higher[.]" *See id.* Ausimont argues that Commerce implausibly reasons that "the large difference in the average volume among the individual models of PTFE resin supports the fact that the average volume of wet reactor bead,

while higher than the average volume of sales of PTFE resin models, is consistent with the pattern of variation in the average volumes among the different models." *Remand Results* at 6. Ausimont argues that this seems to suggest that there is no "norm" for granular PTFE resin, and that using Commerce's reasoning, it would be just as valid to compare the quantitative factors for wet reactor bead to those granular PTFE resin sales that Commerce excluded as outside the ordinary course of trade, and the seven sales of product code 380550 that were sold to three customers were determined by Commerce to be outside the ordinary course of trade even though they were sold in a greater absolute amount than the wet reactor bead sales, their total volume and frequency were greater, and their average quantity was lower. *Cf.* Slip Op. 01-92 at 16-17.

Regarding price, Commerce denied that the average price for wet reactor bead was unusual because "the price ratios of wet reactor bead to PTFE resin were between [   ] and [   ] percent of approximately [      ] percent of the total PTFE resin models." *Remand Results* at 7. Ausimont argues that once again this says nothing about wet reactor bead in comparison with granular PTFE resin as a whole.

Ausimont also complains that Commerce spends much of its analysis comparing the quantitative factors for the wet reactor bead sales with those of product code 380127 for the purpose of determining whether the wet reactor bead sales fall within the normal range of granular PTFE resin sales. Ausimont again criticizes Commerce's justification for its conclusions as based on the assumption that the quantitative factors of a single granular PTFE resin model might approximate those for wet reactor bead rather than an accounting of the whole group.[15]

_____

[15] Ausimont further argues that since Commerce's calculations upon remand demonstrate that product code 380127 was sold below the cost of production and that in accordance with 19

Regarding the market for wet reactor bead, Ausimont criticizes inconsistency in Commerce's argument for, on the one hand, contending that the 1993 determination that there was no market for wet reactor bead is irrelevant on the ground that the statement was not made as part of an ordinary-course-of-trade analysis, while on the other hand attaching great significance to its findings from that determination that the value added to the imported wet reactor bead is small and the process for further-manufacturing granular PTFE resin from that imported wet reactor bead is not complex. The *Remand Results* state that "rather than relying on the findings in previous segments such as the AD Order Circumvention, Commerce has examined the facts of the record of this review and has, independent of prior determinations, concluded that the evidence before it sufficiently merits the finding of a "market[.]" *Id.* at 17. Ausimont argues that in reality, what Commerce has done is ignored "definitive" evidence that there is *no* market for wet reactor bead and proceeded to determine "under an individual model-specific analysis" that the existence of only [    ] sales did not show the lack of a market for wet reactor bead. *Id.* (confidential bracketing added). Ausimont argues that for Commerce to defend its finding of no market for wet reactor bead in Italy on the ground that the finding was made pursuant to an anti-circumvention investigation rather than an ordinary-course-of-trade analysis does not logically render it any less valid than if it had been made as part of an ordinary-course-of-trade analysis, the implication otherwise being that Commerce might have found

---

U.S.C. § 1677(15) and 19 U.S.C. § 1677b(b)(1) sales of product code 380127 should have been excluded as *per se* outside the ordinary course of trade. However, in accordance therewith, Commerce may include below-cost sales in the analysis. *See*, *e.g.*, *Torrington Co. v. United States*, 127 F.2d 1027, 1081 (Fed. Cir. 1997) (according to 19 U.S.C. § 1677(15) "an enterprise may indeed make some sales below cost 'in the ordinary course of trade'").

the existence of a market in 1993 had it been conducting an ordinary-course-of-trade analysis.[16]

Ausimont contends that Commerce understates the significance of the 1993 determination by claiming that its "simple statement that it agrees with respondent that there is virtually no market is meaningless for its ordinary course of trade determination in the instant case." *Id*. Ausimont argues that, in fact, the lack of a market for wet reactor bead was what forced Commerce to resort to cost of production for determining value. *See Preliminary Circumvention Determination*, 57 Fed. Reg. 43219 ("[B]ecause there is virtually no market for PTFE wet raw polymer, we have no other source of observed market prices for PTFE wet raw polymer."). Ausimont asserts that nowhere in the *Remand Results* does Commerce explain *why* it concluded that there is a market for wet reactor bead, other than to state that one must exist because there were [     ] sales of the product. Pl.s' Br. at 30-31, referencing *Remand Results* at 17 ("under an individual model-specific analysis, the existence of only [     ] sales did not show the lack of market for wet reactor bead") (confidential bracketing added). Lastly. Ausimont contends that Commerce implicitly argues that because there is a market for granular PTFE resin, and sales of certain models of granular PTFE resin are also sold in small frequencies and to only one customer, then there must also be a market for wet reactor bead. *Remand Results* at 17. Ausimont argues that this is "specious reasoning" based entirely upon

---

[16] Ausimont further contends that it is disingenuous for Commerce to claim that it did not cite to the two sales of wet reactor bead in the *Final Results* to bolster its conclusion that there is a market for wet reactor bead but only to rebut Ausimont's contention that there is no such market. Ausimont argues that refuting a claim that there is no market for wet reactor bead is the same as arguing that there is a market for wet reactor bead, the flip side of the same coin, and that the "inescapable conclusion" is that Commerce cited the two 1993 sales as proof that there *is* a market for wet reactor bead. Ausimont argues that Commerce has not evaluated all the relevant evidence regarding absence of sales of wet reactor bead by Ausimont in Italy during the period from 1993 through 1997.

Commerce's "self-serving" decision to analyze wet reactor bead as a model of granular PTFE resin, and its refusal to consider its 1993 finding that there is no market for wet reactor bead. In the 1993 circumvention determination, Commerce recognized that wet reactor bead is a product that neither Ausimont, nor any one else, normally sells in Italy, and since 1993 Ausimont has made only the [   ] sales at issue here. Ausimont points out that there were no sales of wet reactor bead to others in 1994, 1995, or 1996[17] and that wet reactor bead is not listed as a product for sale in any of Ausimont's product brochures, yet the fact that only one of its [   ] customers who regularly buy granular PTFE resin bought wet reactor bead during the POR was the deciding factor for Commerce. Ausimont contends that Commerce has ignored these other facts, and that if there was a market for wet reactor bead more of the [   ] other granular PTFE resin purchasers would also be purchasing wet reactor bead.

Regarding the terms of sale, Ausimont continues to assert that the terms and conditions for the contested sales differed significantly from those of granular PTFE resin. It argues that the crucial difference between the contested sales and granular PTFE resin sales is that the contested sales were all contingent upon Ausimont's ability to complete the sale and deliver the product, which is why they were so-called "pending" orders. Ausimont argues that its inability to deliver the product on the targeted delivery dates was why three of the four sales documented in OBS 376 were cancelled.

---

[17] Ausimont further objects to Commerce's statement that because Ausimont's responses for the 1994-95 and 1995-96 administrative periods were not verified, it "can not conclude definitely" whether Ausimont sold wet reactor bead in Italy during those periods because of Ausimont's general questionnaire response that "Ausimont SpA also sells wet reactor bead to unrelated customers in the home market." Ausimont resents the implication that its database for those review periods, which showed no home market sales of wet reactor bead, were incomplete. Pl.'s Br. at 31 n.14. *See Remand Results* at Ex. 2-B.

Commerce stated that it found no evidence for OBS 81, the other wet reactor bead sale examined at verification, "suggesting that the sales transaction of wet reactor bead was based on a pending order." *Id.* at 12. Yet, Ausimont points out, in the comments at the bottom of that confirmation is written "It can be delivered" in Italian. Ausimont further takes issue with Commerce's inability to distinguish between an "open order," in which it is the customer who may no longer wish to purchase, and a "pending order," in which cancellation is at Ausimont's discretion and depends upon the ability to produce and deliver by the targeted delivery date. Commerce concluded that cancellation of sales is not unique to wet reactor bead sales based on the cancellation of one of the documented granular PTFE resin sales. *Id.* at 13. Ausimont points out that this was only one of 21 sales of granular PTFE resin documented by Commerce at verification that were cancelled. In other words, Ausimont asserts, less than 5 percent of the examined granular PTFE resin sales were cancelled, whereas [     ] out of a total of [     ] wet reactor bead sales were cancelled, *i.e.*, 50 percent. This Court has recognized that cancellation of sales is indicative of sales made outside the ordinary course of trade. *Murata Mfg. Co. v. United States*, 17 CIT 259, 264, 820 F. Supp. 603, 607 (1993). Ausimont argues that the significance here is not simply that the orders were cancelled, but why they were cancelled, which is that Ausimont could not produce and deliver the wet reactor bead by the targeted date, and since the sales of wet reactor bead were highly profitable (on average more than two times the gross profit rate for granular PTFE resin), Ausimont contends that it logically follows that it would not choose to cancel these orders unless it could not meet them.

Ausimont further argues wet reactor bead is the only so-called "granular PTFE resin model" that is *not granular* and is shipped, packed with water and various contaminants and residues, in

700-pound sacks. All "granular" PTFE resin is shipped in drums weighing up to 45 pounds. It argues that all granular PTFE resin sales are priced based upon the weight of the shipped product, a term of sale that "cannot simply be explained away as being a matter of negotiation between Ausimont and its customer," and it also argues that the pricing of wet reactor bead, based upon its dry weight instead of its total shipping weight, is unique to wet reactor bead. Since differences in ordering and shipping are relevant to an ordinary-course-of-trade analysis, *see NSK Ltd. v. United States*, 190 F.3d 1321 (Fed. Cir. 1999), Ausimont argues that Commerce has not adequately addressed why this "model" of granular PTFE resin would be packed and shipped differently.

Regarding its claim of unusual commercial quantities, *see* 19 U.S.C. § 1677(17), Ausimont maintains that an average quantity of wet reactor bead sales that was *five times greater* than that of all other granular PTFE resin sales cannot be considered "usual." It argues that even analyzing wet reactor bead as a "model" of granular PTFE resin shows that the contested sales had an average quantity of almost *32 percent greater* than product code 380127, the model with the next-highest average quantity. *See Remand Results*, at Ex. 1. Whether sales of that product should have been excluded from the analysis, Ausimont argues that at a minimum the fact that it was below cost renders its price suspect and that a 32 percent difference in average quantity must trump the absence of any price-quantity correlation.

Ordinary course of trade analysis "should be guided by the purpose of the ordinary course of trade provision which is to 'prevent dumping margins from being based on sales which are not representative' of the home market." *CEMEX*, *supra*, 133 F. 3d at 900 (quoting *Monsanto Co. v. United States*, 12 CIT 937, 940, 698 F. Supp. 275, 278 (1988)). Since questionable sales must be

compared to what is "normal" for sales of the same class or kind, 19 U.S.C. § 1677(15), ordinary course of trade analysis is handled "on a case-by-case basis by examining all of the relevant facts and circumstances." *CEMEX*, *supra*, 19 CIT at 593. *See CEMEX*, *supra*, 133 F. 3d at 900; *Thai Pineapple Public Co. v. United States*, 20 CIT 1312, 1314, 946 F. Supp. 11, 15 (1996); *Murata Mfg. Co.*, *supra*, 17 CIT at 264, 820 F. Supp. at 607. The factors that Commerce has considered in that analysis include home market demand, volume of home market sales, sales quantity, sales price, profitability, customers, terms of sale and frequency of sales. *See Thai Pineapple*, 20 CIT at 1315, 946 F. Supp. at 16. *See also CEMEX*, 19 CIT at 589-593. Because of the deference afforded to Commerce's methodology in determining whether sales are within or without the ordinary course of trade, it is difficult to prove extraordinary sales by focusing on a single facet of the consideration. *See*, *e.g.*, *Koenig & Bauer-Albert AG v. United States*, 259 F.3d 1341, 1345 (Fed. Cir. 2001) (high profits alone may be insufficient to establish that sales are outside the ordinary course of trade); *NTN Bearing Corp. v. United States*, 19 CIT 1221, 1227-29, 905 F. Supp. 1083, 1089-91 (1995) (infrequency alone may be insufficient to establish sales as outside the ordinary course of trade without a complete explanation of the facts establishing such sales as extraordinary).

Regarding the quantitative factors, Commerce justified its "individual model" approach by focusing on the fact that the attributes among the finished products vary "widely" and are generally not substitutable or interchangeable. Ausimont is correct to state that by so doing Commerce has minimized the consideration of relevant data that conflicts or detracts from its conclusions, and Ausimont has amplified a number of these, but it would be incorrect to state that Commerce has "totally eliminated" them from consideration. "Ordinary course of trade" goes beyond quantitative

analysis into consideration of non-quantitative factors, and the burden of proving sales as a matter of fact as having been made outside the ordinary course of trade rests with the claimant. *See*, *e.g.*, *Nacho-Fujikoshi Corp. v. United States*, 16 CIT 606, 608, 798 F. Supp. 716, 718 (1992).

The *Remand Results* evince substantial evidence to support Commerce's observations with respect to total volume, frequency, profit, and price. The evidence is less "substantial" with respect to average quantity, since the average quantity of the contested sales was higher than any of the granular PTFE resin models, and Commerce did not, in fact, draw comparisons on the basis of averages with respect to product code 380127.[18] But, given the fact of "wide" variation in average volume of sales among all granular PTFE resin products, from [  ] kilograms to over [     ] kilograms, *Remand Results* at 6, Commerce's "individual model" comparison to the tail end of the data nonetheless amounts to substantial evidence on the record because the Court cannot disagree that a 32 percent difference in average quantity is "too much" in the absence of some reference point to put the comparison in context. *See* Slip Op. 01-92 at 34 (absolute value has no inherent significance). That is likewise true of Ausimont's usual commercial quantities claim.

The *Remand Results* evince marginally "substantial" evidence in support of Commerce's determination that the [   ] contested sales demonstrate the existence of a "market" for this stuff

---

[18] For that matter, the concept of a "normal" trade obviously requires reference to a standard. In this matter, Commerce regarded the entire range of data "normal" rather than the mean, median, or mode, and yet it is a fundamental tenet of statistical analysis that the measure of central tendency provides an answer to the question of what the typical value of a variable is. Measures of spread and association address the variability of data, and statistics is suited to measuring variability as well. Variability itself is not a valid reason, at least from a statistical standpoint, for cherry-picking from among the range because statistical integrity emphasizes testing the null hypothesis against *all* data in the particular quantitative analyses, not just selected portions. *See*, *e.g.*, *Quantitative Data Analysis: An Introduction*, General Accounting Office, Program Evaluation and Methodology Division, Report 10.1.11 (May 1992).

in Italy. The Court acknowledges Commerce's statement in the circumvention determination that it intended to refer to the U.S., not foreign, market in declaring that there was "virtually no market" for wet reactor bead. The Court is therefore not free to conclude the number of sales at issue, obviously small, does not amount to a "market." *See supra*, note 4.

The *Remand Results* also apparently evince "substantial" evidence that the differences in the terms of sales between the product types did not outweigh their similarities. The determination relies on the fact that the terms of both the contested sales and granular PTFE resin did "not reflect a 'commitment to purchase a particular quantity at a set price' after the customer places an order[,]" *Remand Results* at 12, and on the fact that in this matter "canceled transactions, after orders are placed, are not necessarily unique to wet reactor bead sales[,]" *id*. at 13, and on the fact that "[p]rices are negotiated on a case-by-case basis with individual customers" for both wet reactor bead and granular PTFE resin sales, *id.* (brackets in original). The Court cannot state that focusing on "perfected" sales rather than contingent sales was an illogical or an unreasonable exercise of discretion; indeed, the reasons offered for cancellation indicate demand that could not be fulfilled, which in turn, together with the fact that these are repeat, arm's length transactions, tends to strengthen Commerce's finding with respect to the "market" for wet reactor bead by overshadowing the relatively small number of transactions involved. *But see Mantex,* 841 F. Supp. at 1307 ("marginal demand for a product does not by itself indicate sales are outside the ordinary course of trade [but] such a factor is probative of whether sales 'have been normal in the trade'") (quoting 19 U.S.C. § 1677(15)).

### *Conclusion*

In the final analysis, taking into consideration the *Remand Results* as a whole, the Court must conclude that Ausimont has not met its burden of proving that there is not substantial evidence to support the determination that the contested sales were made not outside the ordinary course of trade or in unusual commercial quantities or that it is otherwise not in accordance with law.  In the absence of such proof, the *Remand Results* must be sustained.

_____
R. KENTON MUSGRAVE, JUDGE

Dated: December 17, 2002
      New York, New York

**ERRATA**

*Ausimont SpA and Ausimont USA v. United States*, Court No. 98-10-03063, Slip Op. 02-148, dated December 17, 2002:

Page 2, line 15, change "do" to "does".

Page 5, line 5, add "the" before "circumvention".

Page 5, note 3, line 6, change "explained" to "explains".

Page 7, note 4, line 12: add "and" after the comma.

Page 26, line 3, change "Nacho-Fuchikoshi" to "Nachi-Fujikoshi".

January 14, 2003